965 A.2d 114

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JUAN
PENA–FLORES, A/K/A JUAN C. PENAFLORES, A/K/A JUAN C.
FLORES, A/K/A JUAN C. PENA AND FAUSTO PARADES, A/K/A
FAUSTO PAREDES, DEFENDANTS–RESPONDENTS.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
CHARLES FULLER, DEFENDANT–RESPONDENT.

Argued March 11, 2008—Re-argued September
22, 2008—Decided February 25, 2009.

8

*Ronald Susswein,* Assistant Attorney General, argued the cause for appellant in State v. Pena–Flores (*Anne Milgram,* Attorney General of New Jersey, attorney; *Mr. Susswein* and *Maura K. Tully,* Deputy Attorney General, of counsel and on the briefs).

*Mary E. McAnally,* Deputy Attorney General, argued the cause for appellant in State v. Fuller (*Anne Milgram,* Attorney General of New Jersey, attorney).

*Antonio R. Espinosa* argued the cause for respondent Juan Pena–Flores (*Andril & Espinosa,* attorneys; *Mr. Espinosa* and *William G. Sanchez,* on the briefs).

*Thomas J. Butler, Jr.,* argued the cause for respondent Fausto Parades (*Butler ◆ Conti,* attorneys).

*Michael W. Kahn* argued the cause for respondent Charles Fuller (*Mr. Kahn,* attorney; *Mr. Kahn* and *Scott A. Sheldon,* on the briefs).

*Joseph P. Connor, Jr.,* Deputy First Assistant Morris County Prosecutor, argued the cause for amicus curiae County Prosecutors Association of New Jersey (*Ronald J. Casella,* President, County Prosecutor's Association, attorney).

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for amicus curiae Office of the Public Defender (*Yvonne Smith Segars,* Public Defender, attorney).

*John J. Farmer, Jr.,* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Arseneault, Whipple, Farmer, Fassett & Azzarello,* attorneys; *Mr. Farmer* and *Joshua C. Gillette,* of counsel and on the briefs).

Justice LONG delivered the opinion of the Court.

At issue in these appeals, which we have consolidated for the purpose of this opinion, is the automobile exception to the warrant requirement. Today, we reaffirm our longstanding precedent that permits an automobile search without a warrant only in cases in which the police have both probable cause to believe that the vehicle contains evidence and exigent circumstances that would justify dispensing with the warrant requirement. The question of whether exigent circumstances exist is to be determined, as it has always been, on a case-by-case basis with the focus on police safety and preservation of evidence.

## I.

### A. Juan Pena–Flores and Fausto Paredes[1]

On October 5, 2005, at approximately 11:00 p.m., Officer Donald Zsak saw a silver Ford Expedition in the left-turn-only lane at the intersection of Centennial Avenue and Raritan Road in Cranford. The driver abruptly moved to the right, cutting off traffic, and proceeded on Centennial Avenue. Zsak eventually stopped the Expedition on Stiles Street in Linden, near the intersection with Willick Road.

As Zsak approached the driver side of the Expedition, he noticed dark tint covering all the windows and a strong smell of "raw marijuana." Because of his role in nearly 150 investigations involving raw marijuana and his special training in the identification of marijuana by sight and smell, Zsak was confident that he had properly identified the odor. At that point, Zsak asked the driver, later identified as Fausto Paredes, to get out and move to the rear of the vehicle, where Zsak conducted a pat-down search.

As Zsak searched Paredes, Officer Ryan Greco arrived to provide assistance. Zsak passed Paredes over to Greco and moved to the passenger side of the Expedition, where he removed the passenger, Juan Pena–Flores, from the car. He conducted a pat-down search, and then turned Pena–Flores over to Greco. Neither Paredes nor Pena–Flores had contraband on his person.

At that point, unable to see into the vehicle because of the tinted windows, Zsak entered the passenger side and began his search. Moments later, he uncovered two clear plastic bags of marijuana on the front passenger-side floor. He then instructed Greco to place Paredes and Pena–Flores under arrest.

Zsak next searched the backseat and found a nine-millimeter handgun in the child safety seat. Thereafter, in various places in the car, he found a large clear plastic bag that contained twenty-two clear plastic bags of suspected marijuana; a large plastic bag that contained fifteen clear individual plastic bags of suspected marijuana; a large plastic bag containing one hundred and eleven

---

[1] With the exception of their roles in the factual setting, we will refer to Pena-Flores and Paredes collectively as "Pena-Flores." We also note that although

clear plastic bags of suspected marijuana; eight clear plastic bags containing residue of a suspected controlled substance; and two boxes containing empty, small plastic bags.

A Union County Grand Jury returned an indictment charging Pena–Flores and Paredes with fourth-degree possession of a controlled dangerous substance, *N.J.S.A.* 2C:35–10(a)(3); third-degree possession of a controlled dangerous substance with intent to distribute, *N.J.S.A.* 2C:35–5(a)(1) and *N.J.S.A.* 2C:35–5(b)(11); third-degree possession of a controlled dangerous substance with intent to distribute within 1,000 feet of school property, *N.J.S.A.* 2C:35–7; third-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5(b); and second-degree unlawful possession of a firearm while possessing a controlled dangerous substance with intent to distribute, *N.J.S.A.* 2C:39–4.1(a).

Defendants moved to suppress, and Officer Zsak, the only witness to testify, established the facts set forth above at an evidentiary hearing. Zsak further testified that it was Cranford Police Department policy to transport one defendant per police car back to police headquarters. In addition to Zsak and Greco, who were already on the scene, there were only three other officers with Cranford police cars available on patrol on October 5, 2005. Zsak explained that because the stop occurred late at night in a heavily trafficked area, and because there was a limited number of officers on duty, it would have been unsafe to leave the car or to guard it while trying to obtain a search warrant.

In his decision, the trial judge noted that Zsak stopped the vehicle lawfully after viewing a traffic violation and found that credible evidence demonstrated that Zsak smelled raw marijuana. Based on the odor emanating from the vehicle, the judge concluded that Zsak lawfully took defendants out of the car to conduct a pat-down search. As for the vehicle, the judge concluded that the search was lawful up to the point at which Zsak placed both defendants under arrest. However, he declared that the additional searches were not lawful and suppressed the evidence found

the spelling of the latter's name varies in the record, we will refer to him as "Paredes."

after Zsak discovered the two bags of marijuana on the passenger-side floor.

The judge denied the motion to suppress regarding the two bags found on the passenger-side floor, but granted the motion in respect of the rest of the evidence, declaring that there was no exigency in the case. According to the judge, the only options available to the officers were impounding the car and seeking a search warrant, or acquiring a telephonic warrant.

The Appellate Division analyzed the facts against the search incident to arrest exception to the warrant requirement under *State v. Eckel*, 185 *N.J.* 523, 888 *A.*2d 1266 (2006), and against the automobile exception under *State v. Dunlap*, 185 *N.J.* 543, 888 *A.*2d 1278 (2006). The panel found that the search incident to arrest exception was inapplicable because neither Paredes nor Pena–Flores was under arrest at the time Zsak began the search of the vehicle. As for the automobile exception, the panel noted that Zsak had probable cause to believe the vehicle contained contraband based on the strong smell of marijuana coming from the car, but rejected the notion that exigency existed:

> [E]xigency cannot be found based upon concern for the safety of the police officers involved, nor in the desire to preserve evidence that might be found in the vehicle. Both defendants, the sole occupants of the Ford, were in the custody of Officer [Greco]. Protective searches of their persons had not revealed any weapons or contraband.... No other confederates were around, nor was it likely that anyone knew of defendants' arrest. Thus, the probability of some third[ ]party [removing the car or evidence] was minimal at best.

As a result, the panel concluded that the search was unlawful under the automobile exception to the warrant requirement. The State filed a petition for certification, which we granted. 191 *N.J.* 311, 923 *A.*2d 228 (2007).

### B. Charles Fuller

Observing defendant Charles Fuller driving a GMC Yukon without a seatbelt, New Jersey State Trooper Terrence Clemens stopped Fuller as he turned left onto Mt. Ephraim Avenue in Camden. The stop occurred at approximately 1:15 p.m. on a busy street in Camden in front of a liquor store. According to the

videotape that was admitted into evidence, the street was crowded with passersby who were looking into the vehicle. Fuller initially denied that he was driving without his seatbelt, but subsequently admitted that he removed his seatbelt to pick up his cell phone from the car floor. Fuller gave Clemens a Pennsylvania driver's license issued to Charles Bradley and a bill of sale.

As Clemens examined the license, he noticed that the photograph did not resemble Fuller and that the license number was handwritten on the back. Because that number is normally typed, the handwriting struck Clemens as peculiar. Clemens questioned Fuller about the disparity between the license photograph and his appearance. Fuller stated that the summer season had darkened his skin tone. Clemens also asked Fuller if he had a New Jersey driver's license. The answer was "no"; Fuller said he was a resident of Philadelphia, where he spent almost all of his time.

During his conversation with Fuller, Clemens noticed several motor-vehicle summonses lying on the backseat of the car. Clemens asked to see the summonses, and Fuller gave him the two documents. Those summonses indicated that Charles Bradley had been cited for motor-vehicle infractions in Camden one day earlier: once for disorderly conduct and once for driving a car with fictitious tags. When asked about the disorderly conduct charge, Fuller responded by indicating that the summons was issued only because of the charging officer's poor attitude.

Because the Camden County Sheriff's Department is capable of identifying an individual on the basis of a tattoo, Clemens asked Fuller if he had any tattoos. Fuller noted that he had a tattoo of a heart on his right arm while pointing to his left arm. When Clemens corrected him, Fuller acknowledged that the tattoo was on his left arm. At that point, three additional troopers arrived at the scene.

Clemens returned to his cruiser and radioed Fuller's Social Security number and date of birth to the Camden County Sheriff's Department. The dispatcher responded that the identity information matched Charles Fuller's Social Security number and birth

date and that Charles Bradley was an alias for Charles Fuller.[2] Clemens also learned that the bill of sale and the Pennsylvania license plate on Fuller's vehicle corresponded to a Ford Expedition, not the GMC Yukon that Fuller was driving.

Clemens directed Fuller to get out of the vehicle and move to the rear. Upon further questioning. Fuller explained that his real name was Charles Bradley but on previous occasions, including an arrest, he had used the name Charles Fuller. Clemens then arrested Fuller for displaying a false driver's license and for hindering his own apprehension. Clemens searched Fuller, finding two large bundles of money in the left side pocket of his cargo pants, and one smaller bundle of money in the left front pocket. After the search, Clemens placed Fuller inside the cruiser.

Along with another trooper, Clemens proceeded to search the interior of the car beginning with the driver-side compartment. Clemens found a loaded handgun inside a plastic bag wedged between the console and the driver's seat, and in the console he found money and two prescription bottles. The names of the prescription holder were scratched off the labels on the bottles, which contained a total of 106 alprazolam (Xanax) pills. Clemens also found a light blue plastic bag containing marijuana in a dashboard compartment above the radio and additional bags of marijuana underneath the backseat. Finally, Clemens found a twenty-eight-inch sword behind the backseat.

A Camden County Grand Jury returned an indictment charging Fuller with fourth-degree possession of a controlled dangerous substance, marijuana, *N.J.S.A.* 2C:35–10(a)(3); third-degree possession of a controlled dangerous substance, alprazolam, *N.J.S.A.* 2C:35–10(a)(1); third-degree possession of a controlled dangerous substance, alprazolam, with intent to distribute, *N.J.S.A.* 2C:35–5(a)(1) and *N.J.S.A.* 2C:35–5(b)(13); third-degree possession of a controlled dangerous substance, marijuana, with intent to distrib-

---

[2] Although the record is not completely clear on the subject, it appears that Fuller's lawful name is Charles Bradley.

ute, *N.J.S.A.* 2C:35–5(a)(1) and *N.J.S.A.* 2C:35–5(b)(11); third-degree possession of a controlled dangerous substance, marijuana and/or alprazolam, with intent to distribute within 1,000 feet of school property, *N.J.S.A.* 2C:35–7; third-degree unlawful possession of a weapon, a handgun, *N.J.S.A.* 2C:39–5(b) and *N.J.S.A.* 2C:58–4; fourth-degree unlawful possession of a weapon, a sword, *N.J.S.A.* 2C:39–5(d); second-degree possession of a weapon, a firearm, while in the course of possessing with intent to distribute a controlled dangerous substance, *N.J.S.A.* 2C:39–4.1(a); second-degree possession of a weapon, a sword, while in the course of possessing with intent to distribute a controlled dangerous substance, *N.J.S.A.* 2C:39–4.1(c); third-degree displaying a false motor vehicle driver's license, which could be used as means of verifying identity, *N.J.S.A.* 2C:21–2.1(c); and second-degree possession of a firearm as a convicted felon, *N.J.S.A.* 2C:39–7.

Fuller moved to suppress the items found in the Yukon, and an evidentiary hearing took place at which the previous facts were established. Before a decision, Fuller entered a plea of guilty to possession of a controlled dangerous substance, marijuana or alprazolam, with intent to distribute within 1,000 feet of school property, and waived his right to appeal pursuant to an agreement with the State. Fuller was sentenced in accordance with the plea agreement to a custodial term of five years with a two-year period of parole ineligibility. The trial judge stayed the sentence for forty-five days to allow Fuller to decide whether to appeal because the judge believed that the Appellate Division's decision in *State v. Eckel,* 374 *N.J.Super.* 91, 863 *A.*2d 1044 (App.Div.2004), *aff'd,* 185 *N.J.* 523, 888 *A.*2d 1266 (2006), could have significant bearing on the case. The State accepted the judge's decision and agreed not to set aside the plea even if Fuller appealed.

Ultimately, the judge supplemented the record, denying the motion to suppress. On appeal, the Appellate Division reversed, declaring that Clemens conducted an illegal search incident to arrest under *Eckel, supra,* 185 *N.J.* at 524, 888 *A.*2d 1266.

The State filed a petition for certification, which we granted. 188 *N.J.* 348, 907 *A.*2d 1009 (2006). We remanded the case to the Appellate Division for consideration under the automobile exception. The Appellate Division reiterated its position that Fuller's motion to suppress should have been granted. We granted the State's subsequent petition for certification. 192 *N.J.* 71, 926 *A.*2d 855 (2007).

## II.

The State asks us to jettison our decision in *State v. Cooke*, 163 *N.J.* 657, 661, 751 *A.*2d 92 (2000), and return to the standard established in *State v. Alston*, 88 *N.J.* 211, 234–35, 440 *A.*2d 1311 (1981), which, it argues, recognizes an unforeseen stop, probable cause, and the inherent mobility of the vehicle as the only requirements for the automobile exception.

Pena–Flores and Fuller argue that *Cooke* was merely a reiteration of this Court's longstanding adherence to enhanced search-and-seizure protections under the automobile exception and that it properly reaffirmed the need for exigent circumstances beyond those arising from the mere mobility of the vehicle.

## III.

■ In similar language, the United States Constitution and the New Jersey Constitution guarantee the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures. *U.S. Const.* amend. IV; *N.J. Const.* art. I, ¶ 7. Warrantless searches are presumptively unreasonable and thus are prohibited unless they fall within a recognized exception to the warrant requirement. *State v. Wilson*, 178 *N.J.* 7, 12, 833 *A.*2d 1087 (2003) (citing *Cooke, supra*, 163 *N.J.* at 664, 751 *A.*2d 92). We detailed those exceptions in *State v. Hill*, 115 *N.J.* 169, 173–74, 557 *A.*2d 322 (1989). They include, among others, plain view, consent, community caretaking, search incident to arrest, and the automobile exception. *Ibid.* It is the two latter exceptions that have been cited by the courts in this case. Indeed,

the distinct but interrelated search incident to arrest and automobile exceptions provide the legal framework under which the facts must be analyzed.

## A.

Under the search incident to arrest exception, the legal seizure of the arrestee automatically justifies the warrantless search of his person and the area within his immediate grasp. *Chimel v. California*, 395 *U.S.* 752, 762–63, 89 *S.Ct.* 2034, 2040, 23 *L.Ed.*2d 685, 694 (1969). The arrest must precede the search. *Smith v. Ohio*, 494 *U.S.* 541, 543, 110 *S.Ct.* 1288, 1290, 108 *L.Ed.*2d 464, 467 (1990). So long as there is probable cause to arrest, the ensuing search is valid even if there is no particular reason to believe that it will reveal evidence, contraband, or weapons. *New York v. Belton*, 453 *U.S.* 454, 461, 101 *S.Ct.* 2860, 2864, 69 *L.Ed.*2d 768, 775–76 (1981). The justification for the search of an arrestee is to preclude him from accessing a weapon or destroying evidence. *Chimel, supra*, 395 *U.S.* at 762–63, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694.

Under the federal Constitution, even if an arrestee is removed and secured elsewhere, a search of the passenger area of his automobile incident to his arrest is permissible. *Belton, supra*, 453 *U.S.* at 460, 101 *S.Ct.* at 2864, 69 *L.Ed.*2d at 775. In 2006, however, we diverged from federal precedent in *Eckel, supra*, 185 *N.J.* at 524, 888 *A.*2d 1266, and declared that the search of the interior compartment of a motor vehicle incident to arrest is limited to the area from which an occupant may, in fact, seize a weapon or destroy evidence. It follows that such a search cannot be sustained where the occupant has been "arrested, removed[,] and secured elsewhere," because the potential for obtaining a weapon or destroying contraband is by then eliminated. *Id.* at 541, 888 *A.*2d 1266. Where an occupant is arrested but not removed or secured, courts are required to make a fact-intensive determination regarding the danger posed by the arrestee. *Ibid.*

■ As is obvious, the search incident to arrest exception is focused on the arrestee himself and on eliminating his potential to endanger the police or destroy evidence. *See Dunlap, supra,* 185 *N.J.* at 548–49, 888 *A.*2d 1278 (holding where defendant was restrained outside car and unable to gain access, search of vehicle was not justifiable as incident to arrest). Although the courts below cited search-incident-to-arrest principles, Pena–Flores was not arrested and Fuller was already secured in the troop car when their respective automobile searches took place. Thus, search incident to arrest is not the proper analytical framework in these cases.

### B.

We thus turn to the automobile exception. Even where a defendant is not under arrest or where an arrested defendant has been secured, there may be justification to search a vehicle under the automobile exception.

■ Under federal constitutional law, a warrantless search of a motor vehicle pursuant to the automobile exception is permissible so long as the vehicle is readily mobile and there is probable cause to believe it contains evidence of criminality. *Pennsylvania v. Labron,* 518 *U.S.* 938, 940, 116 *S.Ct.* 2485, 2487, 135 *L.Ed.*2d 1031, 1036 (1996). Like the search incident to arrest exception, the purposes of the automobile exception are police safety and the preservation of evidence. The underlying rationales for the automobile exception are: (1) the ready mobility of the vehicle and the inherent potential for loss or destruction of evidence before a warrant is obtained; and (2) the decreased expectation of privacy in motor vehicles, which are subject to extensive government regulation. *Ibid.* In effect, under the federal standard, exigency is automatic. *Ibid.*

### IV.

We have never subscribed fully to the federal version of the automobile exception and the relationship of our jurisprudence to

federal jurisprudence has been an uneasy one. Although not a frontal assault on federal precedent, over three decades ago in *State v. LaPorte*, 62 *N.J.* 312, 316–17, 301 *A.*2d 146 (1973), we first suggested that it is the specific facts of the case and not the mere mobility of the automobile that creates exigency. Later, in *State v. Alston*, 88 *N.J.* 211, 216, 440 *A.*2d 1311 (1981), we grappled with the issue directly. There, police detectives pulled over a speeding vehicle and noticed that the individuals in the vehicle were acting furtively, as if attempting to conceal something. *Ibid.* When the driver opened the glove compartment to look for his credentials, the detectives observed shotgun ammunition. *Ibid.* The suspects were asked to exit the vehicle and were frisked, but no weapons were found. *Ibid.* A subsequent search of the automobile revealed a weapon under the front passenger seat. *Id.* at 216–17, 440 *A.*2d 1311. The suspects then were arrested, and a further search yielded two more weapons. *Id.* at 217, 440 *A.*2d 1311. The trial judge suppressed all of the evidence. *Ibid.* The Appellate Division reversed the suppression of the initially discovered weapon, but affirmed the remainder of the judge's order. *Ibid.*

In reversing that suppression, we applied the automobile exception, concluding that probable cause to suspect that the vehicle contained illegal items arose from viewing the shotgun shells in the glove compartment and that "exigency" was satisfied by "the unforeseeability and spontaneity of the circumstances giving rise to probable cause and the inherent mobility of the automobile stopped on the highway." *Id.* at 233, 440 *A.*2d 1311 (citations omitted). In so ruling, we essentially added a requirement that is not part of the federal automobile standard: the stop and search of the vehicle cannot be pre-planned—it must be unforeseen and spontaneous. *See id.* at 233–34, 440 *A.*2d 1311.[3]

---

[3] The dissent accurately recounts our statement in *Alston* that our decision in *State v. Ercolano*, 79 *N.J.* 25, 397 *A.*2d 1062 (1979), was not a departure from federal automobile-exception jurisprudence. *Post* at 41, 965 *A.*2d at 135 (quoting *Alston, supra,* 88 *N.J.* at 233, 440 *A.*2d 1311). However, that does not

On the very day that we decided *Alston*, we also decided *State v. Martin*, 87 *N.J.* 561, 436 *A.*2d 96 (1981), in which we upheld the warrantless search of a vehicle at a police station, based upon "exigency" at the point of arrest. We said:

> The occupants of the car, the suspected robbers, were still at large. Because the police had stopped the car, the occupants were alerted that they might have been suspected of involvement in the armed robbery. They might have returned at any moment to move the car or remove the car's contents. In addition, the officers had reason to believe that the occupants of the station wagon were not only alerted but also armed and dangerous. The illumination in the parking lot where the vehicle was discovered at that early morning hour was dim at best. In view of the possibility of the suspects' return to the car, a careful search at that point was impractical and perhaps not safe for the officers.
>
> The level of exigency in the circumstances surrounding this search was heightened by the fact that the police were actively involved in an ongoing investigation shortly after the armed robbery and near to where it had occurred.... There was an urgent, immediate need for the police to ascertain whether the car contained evidence of the armed robbery, before the suspects had an opportunity to leave the area or to destroy or dispose of other evidence.
>
> Finally, the circumstances that furnished the officers with probable cause were unanticipated and developed spontaneously.
>
> [*Martin, supra,* 87 *N.J.* at 569–70, 436 *A.*2d 96 (quotation marks and citations omitted).]

Obviously, there would have been no need to detail the facts and circumstances that created the exigency had the mere mobility of the vehicle sufficed. Thus, together *Alston* and *Martin* rejected the federal standard by declaring (1) that the stop had to be unforeseen and spontaneous and (2) that exigency must be assessed based on the particular facts and circumstances of the case, and does not automatically flow from the mobility of the vehicle.

In 1991, in *State v. Colvin*, 123 *N.J.* 428, 587 *A.*2d 1278 (1991), we affirmed that view. There, we faced the issue in connection with a vehicle parked on a public street. *Id.* at 429, 587 *A.*2d 1278. Officers were patrolling a high-crime area when they observed the defendant sitting on a porch engaging in a suspected drug transaction. *Id.* at 430, 587 *A.*2d 1278. When the officers approached

---

undermine the importance of what *Alston* added to the automobile-exception calculus in New Jersey.

him, the defendant attempted to flee, at which time he threw a vial of suspected cocaine on the ground. *Ibid.* The officers seized the vial, caught up with the defendant, and arrested him. *Ibid.* Minutes later, an informant told the police that drugs had been stashed in the defendant's car, which was parked near the site of the arrest, and that other people knew about the arrest and would attempt to remove the drugs. *Ibid.* The officers proceeded to the parked and unlocked car, which matched the informant's description, searched it, and discovered packets of cocaine. *Ibid.* The trial judge suppressed the evidence and the Appellate Division affirmed. *Ibid.*

After concluding that the informant's statements demonstrated probable cause, *id.* at 435, 587 *A.*2d 1278, we held that exigency existed, not because of the inherent mobility of the car or the fact that the stop was unanticipated, but rather because

> [a]ny element of surprise had been lost; the vehicle contained the "contraband" drugs; there were "confederates waiting to move the evidence"; [and] the police would need "a special police detail to guard the immobilized automobile." [*Coolidge v. New Hampshire,* 403 *U.S.* 443, 462, 91 *S.Ct.* 2022, 2036, 29 *L.Ed.*2d 564, 580 (1971).] In such circumstances, "it would often be unduly burdensome and unreasonably restrictive to require the police to post a guard and repair to the courthouse for a warrant once they have probable cause to search" the car. *United States v. Bradshaw,* 515 *F.*2d 360, 363 (D.C.Cir.1975). Whether a special police detail is less burdensome when a car is parked on a city street than when the car is stopped on an open highway is open to debate. In either case it may be impracticable.
> [*Colvin, supra,* 123 *N.J.* at 434–35, 587 *A.*2d 1278.]

We concluded that the "justification to conduct a warrantless automobile search does not turn on whether the vehicle is parked or moving." *Id.* at 437, 587 *A.*2d 1278. Rather, the dispositive question is whether "the circumstances ... *make it impracticable*[4] *to obtain a warrant* when the police have probable cause to search the car." *Ibid.* (emphasis added). Accordingly,

> when, without advance planning, police encounter a parked car, have probable cause to believe that the vehicle contains criminal contraband .. *and have*

---

4 According to *Black's Law Dictionary* 1210 (8th ed. 1999), impracticable means not "reasonably capable of being accomplished; [not] feasible."

*articulable reasons to believe that the evidence may otherwise be lost or destroyed,* they may seize and search the vehicle for the contraband without the necessity of a warrant.

[*Id.* at 429–30, 587 *A.*2d 1278 (emphasis added).]

*Colvin* is crystal clear: exigency above and beyond the mere mobility of the vehicle is required. In particular, *Colvin* mandated "articulable" reasons to believe that the evidence would be at risk if a search was delayed. *Id.* at 429, 587 *A.*2d 1278. The pellucidity of *Colvin* underscores that what we said in *Alston* and *Martin* was neither "mistaken" nor "unwitting," as the dissent suggests. *Post* at 37, 965 *A.*2d at 133.

Nine years later in *Cooke, supra,* 163 *N.J.* at 665, 751 *A.*2d 92, we affirmed that view when we addressed the issue of exigent circumstances and the automobile exception in light of *Labron, supra,* 518 *U.S.* at 940, 116 *S.Ct.* at 2487, 135 *L.Ed.*2d at 1036, and *Maryland v. Dyson,* 527 *U.S.* 465, 466, 119 *S.Ct.* 2013, 2014, 144 *L.Ed.*2d 442, 445 (1999), which had reaffirmed that under federal precedent the automobile exception has "no separate exigency requirement." [5] *Dyson, supra,* 527 *U.S.* at 466, 119 *S.Ct.* at 2014, 144 *L.Ed.*2d at 445. In *Cooke, supra,* the police had received information from a reliable informant that the defendant was selling drugs in a particular location, and storing the drugs in a gray Ford Escort. 163 *N.J.* at 662, 751 *A.*2d 92. A police officer watching a housing complex in a high-crime area "observed [the] defendant in a parking lot working on what appeared to be the radio speakers within [a] Ford Escort." *Ibid.* The officer contin-

---

[5] In *Labron, supra,* the Supreme Court of the United States noted that the automobile exception initially was premised on "the automobile's 'ready mobility,' an *exigency* sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear." 518 *U.S.* at 940, 116 *S.Ct.* at 2487, 135 *L.Ed.*2d at 1035–36 (emphasis added) (citing *California v. Carney,* 471 *U.S.* 386, 390–91, 105 *S.Ct.* 2066, 2068, 85 *L.Ed.*2d 406, 412 (1985); *Carroll v. United States,* 267 *U.S.* 132, 45 *S.Ct.* 280, 69 *L.Ed.* 543 (1925)). However, the Court relied on more recent cases to explicitly hold that, under the federal Constitution, requiring "unforeseen circumstances involving the search of an automobile .... [is] incorrect." *Id.* at 940, 116 *S.Ct.* at 2487, 135 *L.Ed.*2d at 1035 (quotation marks and citation omitted).

ued watching as the defendant engaged in what appeared to be a drug transaction in which he retrieved the drugs from a nearby Hyundai. *Ibid.* Two similar transactions subsequently were observed involving the Hyundai and the Ford Escort. *Ibid.* The defendant then drove away in the Hyundai. *Ibid.* The Hyundai was stopped, and the defendant was arrested pursuant to an unrelated outstanding warrant. *Id.* at 662–63, 751 *A.*2d 92. A search of his person yielded the keys to the Escort. *Id.* at 663, 751 *A.*2d 92. The officers then searched the Escort and discovered illegal drugs. *Ibid.*

A trial judge granted the defendant's motion to suppress based on the absence of exigency. *Ibid.* The vehicle was not " 'readily mobile,' " the defendant was in custody, the police had the keys to the Escort, and an officer was surveilling the Escort. *Ibid.* According to the judge, under those circumstances, the police should have obtained a warrant prior to searching the Escort, a decision with which the Appellate Division agreed. *Ibid.*

In reviewing the order to suppress, we turned to first principles. " 'The requirement that a search warrant be obtained before evidence may be seized is not lightly to be dispensed with, and the burden is on the State ... to bring it within one of those recognized exceptions.' " *Id.* at 664, 751 *A.*2d 92 (quoting *Alston, supra,* 88 *N.J.* at 230, 440 *A.*2d 1311). Justice Verniero, writing for the Court, detailed the federal version of the automobile exception and noted that *Labron, supra,* 518 *U.S.* at 940, 116 *S.Ct.* at 2487, 135 *L.Ed.*2d at 1036, had reaffirmed probable cause and the mobility of the automobile as the only requirements in the federal courts. *Cooke, supra,* 163 *N.J.* at 665, 751 *A.*2d 92. As Justice Verniero noted, *Labron* "essentially disposed of the additional requirement of exigent circumstances" when discerning the applicability of the automobile exception. *Id.* at 666, 751 *A.*2d 92.

Looking to our own Constitution, along with "our unwavering precedent and the important rights at stake," *id.* at 670, 751 *A.*2d 92, in *Cooke* we affirmed that the exigency inquiry has always

been a part of New Jersey's automobile exception. *Id.* at 667, 670–71, 751 *A.*2d 92. We explained why:

> Without a requirement of exigent circumstances, virtually every search of an automobile would be valid provided the police had probable cause to act. For example, . . . a car parked in the home driveway of vacationing owners would be a fair target of a warrantless search if the police had probable cause to believe the vehicle contained drugs. Such a broad ruling has no basis in our case law.
>
> [*Id.* at 667–68, 751 *A.*2d 92 (citing *Colvin, supra,* 123 *N.J.* at 431, 587 *A.*2d 1278).]

By way of example, but not limitation, we went on to repeat the kinds of considerations that could factor into the "exigency" calculus for purposes of the automobile exception established in our prior decisions in *Alston, Martin, LaPorte,* and *Colvin.* *Id.* at 668–71, 751 *A.*2d 92.

In *Cooke, supra,* we held that exigent circumstances justified the warrantless search of the Escort. 163 *N.J.* at 675–76, 751 *A.*2d 92. Several factors supported that holding: the impracticability of the surveilling officer leaving his post to secure the Escort; the loss of the element of surprise after arresting the defendant; that third parties knew of the Escort's location and knew that the defendant stored drugs there; that the drugs may have been removed or destroyed; that the Escort could be removed; and that the Escort was in a high-crime area. *Id.* at 675, 751 *A.*2d 92. "[A]ny one of [those] factors, standing alone, would be insufficient to support a finding of exigency," but when combined, the warrantless search was justified. *Id.* at 675–76, 751 *A.*2d 92.

*Cooke* provided us with a long view of the development of automobile-search jurisprudence in New Jersey. Like its predecessors, *Cooke* demonstrates that the initial policy rationales that justified the existence of the federal automobile exception to the warrant requirement are only part of the larger "exigency" consideration in this State. Thus, courts must not only consider the mobility of the vehicle or the lessened expectation of privacy in it, but also must look to all of the facts and circumstances surrounding the search to determine the existence of exigency.

In 2006, in a unanimous opinion, we decided *Dunlap, supra,* 185 *N.J.* at 543, 888 *A.*2d 1278, which began when the police were notified that an individual had found a handgun and drugs in her daughter's bedroom. *Id.* at 544, 888 *A.*2d 1278. When they arrested the daughter, she stated that the contraband belonged to her boyfriend (the defendant), who was a suspect in other drug crimes and had previously been arrested. *Id.* at 544–45, 888 *A.*2d 1278. She said that if the defendant came to her house, he likely would have heroin on him; that he often carried guns; and that he would drive a green Hyundai. *Id.* at 545, 888 *A.*2d 1278. At the urging of the officers, who had obtained authorization for a consensual telephonic interception, the daughter called the defendant and asked him to come to her residence. *Ibid.*

Shortly thereafter, defendant arrived and exited the Hyundai. *Ibid.* Two officers tackled him as he was walking to the house and arrested him. *Ibid.* At that time, approximately ten officers were at the scene. *Ibid.* The officers then unlocked the Hyundai and immediately detected the smell of burning marijuana. *Ibid.* They searched the entire passenger compartment and the glove box, and discovered suspected heroin. *Id.* at 545–46, 888 *A.*2d 1278. They also searched a "trap" in the Hyundai and found further evidence. *Id.* at 546, 888 *A.*2d 1278.

As part of its justification for the warrantless search, the State asserted that the automobile exception applied. *Id.* at 549, 888 *A.*2d 1278. We ultimately upheld the Appellate Division's decision that probable cause existed but exigency did not. *Id.* at 549–51, 888 *A.*2d 1278. The Appellate Division cited the residential nature of the neighborhood; the fact that no third parties knew of defendant's destination or his arrest; the number of officers on the scene available to oversee the car while a warrant was sought; and the failure of the police to seek a telephonic warrant when they had just used the telephone to obtain verbal authorization for a consensual recording of defendant's conversation with his girlfriend. *Id.* at 550, 888 *A.*2d 1278.

We concluded: "[T]he decision of the Appellate Division is fully supported in every respect by the record and is legally unexceptionable." *Id.* at 550–51, 888 *A.*2d 1278. "The standards remain the same: probable cause and exigent circumstances, each of which to be determined on a case-by-case basis." *Id.* at 551, 888 *A.*2d 1278. In that case, "the unique facts, particularly the presence of ten officers, fully justified the ... conclusion that exigency was absent." *Ibid.* We cautioned, however, that "[d]ifferent facts, such as a roadside stop effectuated by only one or two officers, would likely have changed the calculus." *Ibid.*

*Dunlap* precisely captured the point in respect of the exigency element. Indeed, in *Dunlap* we noted that *"[p]olice safety and the preservation of evidence,"* which are the policy rationales underlying the search incident to arrest exception, *see State v. Pierce,* 136 *N.J.* 184, 197–98, 642 *A.*2d 947 (1994), are also the "preeminent determinants" of exigency for purposes of applying the automobile exception. *Dunlap, supra,* 185 *N.J.* at 551, 888 *A.*2d 1278 (emphasis added).

 Thus, in accordance with "our unwavering precedent," *Cooke, supra,* 163 *N.J.* at 670, 751 *A.*2d 92, the warrantless search of an automobile in New Jersey is permissible where (1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant. *Id.* at 667–68, 751 *A.*2d 92; *Alston, supra,* 88 *N.J.* at 230–34, 440 *A.*2d 1311. The notion of exigency encompasses far broader considerations than the mere mobility of the vehicle. *See Dunlap, supra,* 185 *N.J.* at 551, 888 *A.*2d 1278; *Cooke, supra,* 163 *N.J.* at 667–68, 751 *A.*2d 92; *Colvin, supra,* 123 *N.J.* at 434–35, 587 *A.*2d 1278; *Martin, supra,* 87 *N.J.* at 569–70, 436 *A.*2d 96; *LaPorte, supra,* 62 *N.J.* at 316, 301 *A.*2d 146.

 Exigency must be determined on a case-by-case basis. *Dunlap, supra,* 185 *N.J.* at 551, 888 *A.*2d 1278. No one factor is dispositive; courts must consider the totality of the circumstances. *Cooke, supra,* 163 *N.J.* at 675, 751 *A.*2d 92. How the facts of the

case bear on the issues of officer safety and the preservation of evidence is the fundamental inquiry. *Dunlap, supra,* 185 *N.J.* at 551, 888 *A.*2d 1278; *see Colvin, supra,* 123 *N.J.* at 429–30, 587 *A.*2d 1278; *State v. Esteves,* 93 *N.J.* 498, 506, 461 *A.*2d 1128 (1983). There is no magic formula—it is merely the compendium of facts that make it impracticable to secure a warrant. *Colvin, supra,* 123 *N.J.* at 434, 587 *A.*2d 1278 (citing *Coolidge, supra,* 403 *U.S.* at 462, 91 *S.Ct.* at 2036, 29 *L.Ed.*2d at 580). In each case it is the circumstances facing the officers that tell the tale.

■ Legitimate considerations are as varied as the possible scenarios surrounding an automobile stop. They include, for example, the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not, whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk.[6] As we have previously noted,

---

[6] Contrary to our dissenting colleagues' characterization, our ruling today is nothing more than a reaffirmation of over three decades of prior jurisprudence from *LaPorte, supra,* 62 *N.J.* at 316–17, 301 *A.*2d 146, through *Cooke, supra,* 163 *N.J.* at 667–68, 751 *A.*2d 92, and *Dunlap, supra,* 185 *N.J.* at 551, 888 *A.*2d 1278. We do not, by this opinion, establish a new "multi-factor test." *Post* at 47, 965 *A.*2d at 139. To the contrary, we have merely detailed, by way of example but not limitation, the various factors that our prior cases have recognized as relevant to an exigency analysis. Why such a recounting would result in the dire consequences suggested by the dissent, *see post* at 37, 40–41, 47, 965 *A.*2d at 133, 135, 139, is a mystery to us. Indeed, if the law is as it has always been (and it is), what logic is there to the dissent's suggestion that under our opinion the police will "impound more cars while they apply for warrants, leaving drivers and passengers in custodial limbo in the process"? *Post* at 37, 965 *A.*2d at 133. The answer is clearly none.

We have no quarrel with the right of the dissent to suggest a break with our deeply rooted jurisprudence. We resist only its refusal to acknowledge that its proposed divergence from precedent is not precipitated by anything in this opinion, in which we merely recount the story of our past.

"[f]or purposes of a warrantless search, exigent circumstances are present when law enforcement officers do not have sufficient time to obtain *any form* of warrant." *State v. Johnson*, 193 *N.J.* 528, 556 n. 7, 940 *A.*2d 1185 (2008) (emphasis added) (citing *Warden v. Hayden*, 387 *U.S.* 294, 298–99, 87 *S.Ct.* 1642, 1645–46, 18 *L.Ed.*2d 782, 787 (1967)).

## V.

We turn next to the facts of these cases. Pena–Flores was arrested apparently based on the results of the search, thus obviating the applicability of the search incident to arrest exception. At issue is whether the automobile exception applies. Clearly, the vehicle was legitimately stopped for a traffic violation. The overwhelming smell of marijuana emanating from the automobile gave the officer probable cause to believe that it contained contraband. *State v. Nishina*, 175 *N.J.* 502, 515–16, 816 *A.*2d 153 (2003) (holding that smell of marijuana constitutes probable cause to believe crime has been committed and that additional contraband might be present). Thus, the inquiry turns to exigency.

Here, the stop was unexpected; the police had no prior information of criminality and stopped the vehicle only in response to an aggressive traffic maneuver late at night on the side of a highly traveled road. Importantly, Zsak was unable to look for weapons or contraband from outside the vehicle because the windows were heavily tinted. That, in itself, is illegal. *N.J.S.A.* 39:3–74 ("No person shall drive any motor vehicle with any sign, poster, sticker or other non-transparent material upon the front windshield ... or front side windows of such vehicle. ...").

Initially, Paredes and Pena–Flores were removed from the vehicle, but were not placed under arrest or secured inside of Greco's patrol car. The ratio of police officers to suspects was two-to-two, and there was no available backup. Indeed, we view the circumstances here as what we contemplated as the counterpoint to the facts in *Dunlap, supra*, 185 *N.J.* at 551, 888 *A.*2d 1278, where we said "[d]ifferent facts, such as a roadside stop effectuat-

ed by only one or two officers, would likely have changed the calculus." In short, we are satisfied that the circumstances facing the officers gave rise not only to probable cause, but also to exigency, thus satisfying the standards governing the automobile exception. We therefore reverse the judgment of the Appellate Division to the contrary.

 We turn next to Fuller, with regard to whom we reach a different conclusion. Clemens pulled Fuller over unexpectedly for a traffic violation.[7] As a result of a lookup, Clemens determined that the license plate and the bill of sale did not correspond to Fuller's vehicle. Accordingly, he was entitled, separate and apart from the automobile exception, to look into the areas in the vehicle in which evidence of ownership might be expected to be found. *State v. Boykins*, 50 *N.J.* 73, 77, 232 *A.*2d 141 (1967) (citations omitted); *State v. Jones*, 195 *N.J.Super.* 119, 122–23, 478 *A.*2d 424 (App.Div.1984) ("[W]here there has been a traffic violation and the operator of the motor vehicle is unable to produce proof of registration, a police officer may [conduct a] search [of] the car for evidence of ownership . . . . confined to the glove compartment or other area where a registration might normally be kept in a vehicle." (quotation marks and citation omitted)). *See also United States v. Kelly*, 267 *F.Supp.*2d 5, 14 (D.D.C.2003) ("[I]t is reason-able for [an] officer to conduct a limited search for the registration in those areas where the registration would likely be located."); 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 7.4(d) (4th ed. 2004) ("[I]t is reasonable for the police to make a limited search of a vehicle in an effort to determine ownership.").

 During that search in the area of the center console, Clemens inadvertently found a loaded handgun wedged between

---

[7] As for Fuller's contention that he was impermissibly removed from his vehicle, established precedent from this Court permits officers in the course of a legal stop to order the driver out of the vehicle. *State v. Smith*, 134 *N.J.* 599, 611, 637 *A.*2d 158 (1994) (holding police officers have automatic right to remove driver of lawfully stopped vehicle to ensure officer safety).

the console and the front seat, and, in the console, prescription bottles containing 106 Xanax pills. Those items were not subject to suppression.

Although what was uncovered in the search for credentials unexpectedly provided probable cause to believe additional contraband and weapons might be present in the automobile, that, standing alone, did not warrant a further search. Fuller was arrested and secured in the vehicle, thus obviating resort to the search incident to arrest exception. *Eckel, supra,* 185 *N.J.* at 541, 888 *A.*2d 1266. The only justification to search that remained was the automobile exception. As we have said, in order for the automobile exception to come into play, exigency was required.

Citing *Dunlap,* Fuller argues that there was no exigency, a notion with which we agree. Here, Clemens pulled Fuller over for a traffic violation in broad daylight on a city street at 1:15 in the afternoon. Fuller was subsequently arrested and secured inside the cruiser, and thus had no opportunity to gain access to the vehicle or anything it contained. There is nothing in the record to suggest that Fuller had cohorts who might have come on the scene. Clemens was, at all times, assisted by one to three other troopers. The vehicle could have been impounded or one officer could have remained with it while a warrant was sought by telephone or in person. There was simply no urgent, immediate need for the officers to conduct a full search of the automobile. *See Dunlap, supra,* 185 *N.J.* at 550, 888 *A.*2d 1278.

We see this as an analog to *Dunlap,* in which we concluded that there was no exigency. Although we referenced the extraordinary number of officers present in *Dunlap,* it was not a mere matter of head counting, but a proper substantive analysis of all of the facts and circumstances surrounding the search. When that kind of analysis is performed in this case, it satisfies us that exigency was absent. In sum, the combination of probable cause and exigent circumstances was not present, thus vitiating invocation of the automobile exception. Accordingly, the evidence that was uncovered in areas of the vehicle in which credentials would not

normally be kept (under and behind the backseat and in the radio compartment) was subject to suppression.

## VI.

A few final observations. We recognize, as the dissent argues, that exigency assessments are difficult for the officer on the street and that life would be simpler if we returned to a pure *Alston* analysis. However, as much as ease of application matters, it has never been our only polestar. Instead, as we said in *Cooke, supra*, 163 *N.J.* at 670, 751 *A.*2d 92, the importance of the rights involved has lit our way. Thus, instead of abandoning our principles, we see this as an opportunity for procedural change.

For example, there is a suggestion in our case law that a search pursuant to a telephonic warrant should be treated, analytically, as a warrantless search. *State v. Valencia*, 93 *N.J.* 126, 137, 459 *A.*2d 1149 (1983). As a result, it may be that resort to such warrants has been inhibited. It makes sense that if a telephonic warrant is treated as the equivalent of no warrant at all, police would generally see no benefit in the procedure. Moreover, our Court Rules have underscored the problem by requiring an applicant for a telephonic warrant to prove to the judge "that exigent circumstances exist sufficient to excuse the failure to obtain a written warrant." *R.* 3:5–3(b). By that requirement, which replicates the justification necessary to uphold a warrantless search, the telephonic or electronic warrant maintains its place in the hierarchy as a second-class citizen.

It seems to us that our procedures for seeking a warrant would be improved by recognizing what other jurisdictions have long acknowledged—that a warrant obtained by telephonic or electronic means is the analytical equivalent of an in-person warrant and should be treated accordingly. *See, e.g., Cal.Penal Code* § 1526(b) (West 2008) (providing that "[i]n lieu of the written affidavit required in subdivision (a), the magistrate may take an oral statement under oath" provided certain transcription requirements are met); *N.Y.Crim. Proc. Law* § 690.45(2) (McKinney

2008) (requiring only that "[w]here the search warrant has been obtained on an oral application, it shall so indicate and shall state the name of the issuing judge and the time and date on which such judge directed its issuance"); *Or.Rev.Stat.* § 133.545(5) (2007) ("Instead of the written affidavit described in subsection (4) of this section, the judge may take an oral statement under oath .... [and that] statement shall be considered to be an affidavit for the purposes of this section."); *Wis. Stat.* § 968.12(3) (2007) ("A search warrant may be based upon sworn oral testimony communicated to the judge by telephone, radio or other means of electronic communication...."); *Wash.Crim. R.* 2.3(c) (2008) ("There must be an affidavit, a document as provided [by statute], or sworn testimony establishing the grounds for issuing the warrant. The sworn testimony may be an electronically recorded telephonic statement.").

We note that that approach has been embraced by scholars as well. In a thorough analysis of the San Diego Search Warrant Project, researchers concluded not only that telephonic warrants should not be treated as less authoritative than in-person warrants, but also that such warrants may benefit the state, defendants, and the bench and bar. Laurence A. Benner & Charles T. Samarkos, *Searching for Narcotics in San Diego: Preliminary Findings from the San Diego Search Warrant Project*, 36 *Cal. W.L.Rev.* 221, 223, 263, 265 (2000).

> One of the most puzzling questions is also why the use of statutorily authorized telephonic search warrant procedures has been so limited. We believe that the expanded use of telephonic warrants would enhance the efficiency of both the police and the judiciary.... [T]he Supreme Court ruled in *United States v. Leon*[, 468 *U.S.* 897, 104 *S.Ct.* 3405, 82 *L.Ed.*2d 677 (1984) ] that a magistrate's determination of probable cause is to be given great deference by a reviewing appellate court and evidence will not be excluded even if the magistrate erred, so long as the officer reasonably relied upon the magistrate's determination. It would therefore seem that one of the best ways to ensure that an officer has reasonably relied upon the magistrate is to make sure that the magistrate has been provided with all the facts rather than just the mind-numbing verbiage embodied in the boilerplate of the typical affidavit. From the judiciary's perspective we believe it would also be a refreshing change for the officer to actually talk to the judge and explain his or her grounds for probable cause in plain common-sense language. Guided by a Deputy District Attorney who structures the sworn verbal statement with a check list of

questions, there is little danger such oral affidavits, which are tape recorded and transcribed, will be found insufficient on any technical ground. This method would also eliminate a potential source of delay in the ultimate execution of search warrants once probable cause is obtained.
[*Id.* at 265 (footnote omitted).]

Those authors propose that telephonic warrants are not only a permissible method of satisfying the Fourth Amendment, but also an advisable step into the twenty-first century. *Ibid.; see also* Justin H. Smith, Note, *Press One for Warrant: Reinventing the Fourth Amendment's Search Warrant Requirement Through Electronic Procedures,* 55 *Vand. L.Rev.* 1591, 1614–18 (2002) (disputing critics' argument that "the lack of demeanor evidence" and "the absence of a written record" justify disparate treatment of telephonic warrants). "Bypassing the written application requirement is, in reality, one of the most effective ways to decrease the amount of time needed to procure a warrant. As long as another permanent form of documentation is created, few criticisms of the telephonic procedure are justified." Smith, *supra,* 55 *Vand. L.Rev.* at 1618.

The foregoing observations seem to us to be intuitively correct. In furtherance of them, we will amend *Rule* 3:5–3(b) to clarify the parity between the various methods for obtaining a warrant and to underscore that an officer may resort to electronic or telephonic means without the need to prove exigency.

In addition, we will establish a Task Force, including representatives of the Attorney General, the Prosecutors, the Public Defender, the defense bar, and the judiciary, to address the practical issues involved in obtaining telephonic and electronic warrants.[8] The Task Force will study the telephonic and electronic warrant procedures and make practical suggestions to ensure that technology becomes a vibrant part of our process. That will include

---

[8] For example, the State argues that, in reality, obtaining such a warrant is a difficult and time-consuming effort, in the main because judges are not always instantly available. There may be problems in developing an effective scheme to obtain warrants electronically or telephonically, but quick access to a judge should not be one of them.

recommendations for uniform procedures (including forms), equipment, and training, along with an evaluation of the scheme once it is underway.

We take that action under our supervisory authority, cognizant of our " 'responsibility to guarantee the proper administration of ... criminal justice.' " *State v. Cook*, 179 *N.J.* 533, 561, 847 *A.*2d 530 (2004) (quoting *State v. Williams*, 93 *N.J.* 39, 62, 459 *A.*2d 641 (1983)).

As we said in *Cook*, in connection with the recording of custodial interrogations, "[t]he proverbial 'time has arrived.' " *Id.* at 562, 847 *A.*2d 530. We should give police access to an efficient and speedy electronic and telephonic warrant procedure that will be available to them on the scene; that will obviate the need for difficult exigency assessments; and that will guarantee our citizens the protections that the warrant requirement affords—an evaluation of probable cause by a neutral judicial officer.

Finally, we note that the enhanced availability of electronic and telephonic warrants is not intended to supplant the traditional exceptions to the warrant requirement. We continue to recognize the right of officers to search a motor vehicle without a warrant where probable cause and exigent circumstances coexist.

## VII.

The judgment of the Appellate Division in *Pena–Flores* is reversed. The judgment of the Appellate Division in *Fuller* is affirmed in part and reversed in part. The cases are remanded to the respective trial courts for proceedings consistent with this opinion.

Justice ALBIN, dissenting.

The Court ordered further arguments in the cases before us so that we might "revisit[ ] much of our prior precedent, which declared both probable cause and exigent circumstances necessary" to justify an automobile search. The majority has decided

to follow and build on that precedent. In that respect, today's decision represents the final interment of the automobile exception to the warrant requirement in New Jersey—a doctrine followed by the federal courts and most state courts in this country for more than eighty years. In my view, the majority opinion will provide neither greater liberty nor security to the people of this State, but will place greater and unnecessary burdens on law enforcement.

The abandonment of the automobile exception surely did not come about through one decisive, philosophical break with the federal constitutional standard. Rather, over the course of years, in one case after another, through a series of mistaken and unwitting steps, we have marched into our present jurisprudential quagmire. Following precedent serves many valuable and laudable goals. But sometimes in the law, as in life, we have to admit when we have traveled down the wrong path—and not continue merely because it is difficult to change course or retrace our steps. *Stare decisis* is not a command to follow the mistakes of the past.

Under the standard adopted by the majority, police officers—who lawfully stop a motor vehicle on a highway and have probable cause to believe that there is evidence of a crime inside the vehicle—will have to secure a search warrant before conducting a search, unless they wish to hazard a guess that they meet the majority's formless "exigent-circumstances" test. The police officers who have the hopeless task of applying that amorphous test will find, as they do here, that there will be ample opportunity for trial courts to second-guess their actions and appellate courts to second-guess trial courts' decisions. Caution will lead officers to impound more cars while they apply for warrants, leaving drivers and passengers in custodial limbo in the process. The liberty of the car's occupants therefore will be sacrificed for the illusory purpose of promoting their privacy. Because that approach is not a positive development under our State Constitution, we should return to this State's traditional automobile exception and allow police officers to conduct a warrantless search provided that they

have probable cause based on unanticipated information acquired at the time of the search. Therefore, I respectfully dissent.

## I.

The Fourth Amendment has had to adapt to realities unimagined by the Founders of our Republic. One new reality was the invention of the automobile. With the mass use of cars came the automobile exception to the warrant requirement. *See Carroll v. United States,* 267 *U.S.* 132, 153, 45 *S.Ct.* 280, 285, 69 *L.Ed.* 543, 551 (1925).

Several rationales have been given for not requiring police officers to secure a warrant before conducting a search of an automobile when the officers have probable cause to believe the vehicle contains evidence of a crime. One is that the inherent mobility of the vehicle makes it impracticable to obtain a warrant and another is that a car, given its pervasive regulation by the state, is accorded a lesser expectation of privacy than, say, a house. *See, e.g., California v. Carney,* 471 *U.S.* 386, 390–92, 105 *S.Ct.* 2066, 2068–70, 85 *L.Ed.*2d 406, 412–14 (1985); *South Dakota v. Opperman,* 428 *U.S.* 364, 367–68, 96 *S.Ct.* 3092, 3096, 49 *L.Ed.*2d 1000, 1004–05 (1976); *Carroll, supra,* 267 *U.S.* at 153, 45 *S.Ct.* at 285, 69 *L.Ed.* at 551; *State v. Patino,* 83 *N.J.* 1, 9, 414 *A.*2d 1327 (1980). But those are not the only, and perhaps not even the most persuasive, justifications for the current application of the automobile exception to the warrant requirement.

In *Chambers v. Maroney,* Justice Byron White observed that when weighing Fourth Amendment values it is "debatable" whether an immediate search of a car, based on probable cause, is a "greater" intrusion than impounding the vehicle until a magistrate grants approval for a warrant. 399 *U.S.* 42, 51–52, 90 *S.Ct.* 1975, 1981, 26 *L.Ed.*2d 419, 428 (1970). Because in the case of a car search it is questionable whether a warrant provides greater Fourth Amendment protection to the individual, he concluded that "[f]or constitutional purposes, [there is] no difference between on the one hand seizing and holding a car before presenting the

probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant." *Ibid.* Under the Fourth Amendment, "[g]iven probable cause to search, either course is reasonable."[1] *Id.* at 52, 90 *S.Ct.* at 1981, 26 *L.Ed.*2d at 428.

Although Justice White and Justice Thurgood Marshall had many disagreements in interpreting the Constitution,[2] they both recognized the propriety and utility of the automobile exception. Justice Marshall observed that "the warrantless search [of an automobile] is permissible because a warrant requirement would not provide significant protection of the defendant's Fourth Amendment interests." *United States v. Ross,* 456 *U.S.* 798, 831, 102 *S.Ct.* 2157, 2176, 72 *L.Ed.*2d 572, 598 (1982) (Marshall, J., dissenting). He too noted that the "Court has refused to require a warrant in situations where the process of obtaining such a warrant would be more intrusive than the actual search itself." *Ibid.* Justice Marshall found no superior Fourth Amendment benefit in compelling a police officer to impound a vehicle and take

---

[1] In *Chambers*, the Court also held that a police officer who could conduct a warrantless search of a car at the scene pursuant to the automobile exception could likewise conduct a warrantless search of the car at headquarters. 399 *U.S.* at 52, 90 *S.Ct.* at 1981–82, 26 *L.Ed.*2d at 428–29.

Here, I would depart from the United States Supreme Court's extension of the automobile exception. Whatever inherent exigency justifies a warrantless search at the scene under the automobile exception certainly cannot justify the failure to secure a warrant after towing and impounding the car. The Fourth Amendment should not be sacrificed to fake exigencies. I am not suggesting, however, that under appropriate circumstances an inventory of a car at headquarters cannot be undertaken pursuant to *State v. Slockbower,* 79 *N.J.* 1, 397 *A.*2d 1050 (1979), and *State v. Ercolano,* 79 *N.J.* 25, 397 *A.*2d 1062 (1979). Therefore, under Article I, Paragraph 7 of the New Jersey Constitution, I would limit the automobile exception to on-scene warrantless searches.

[2] *See, e.g., Steagald v. United States,* 451 *U.S.* 204, 101 *S.Ct.* 1642, 68 *L.Ed.*2d 38 (1981); *Jenkins v. Anderson,* 447 *U.S.* 231, 100 *S.Ct.* 2124, 65 *L.Ed.*2d 86 (1980); *United States v. Havens,* 446 *U.S.* 620, 100 *S.Ct.* 1912, 64 *L.Ed.*2d 559 (1980); *Rhode Island v. Innis,* 446 *U.S.* 291, 100 *S.Ct.* 1682, 64 *L.Ed.*2d 297 (1980).

into custody its occupants, while the officer seeks the issuance of a warrant, rather than searching the vehicle on the spot. *See ibid.*

Despite the vastly different jurisprudential approaches that members of the United States Supreme Court have taken in construing the Fourth Amendment, even concerning automobile searches, it appears that the Justices have subscribed to the general contours of the automobile exception to the warrant requirement.[3] Impounding vehicles and taking into custody their occupants while the police seek a search warrant is not a Fourth Amendment panacea. Nor is it a virtue to be extolled under Article I, Paragraph 7 of our State Constitution. Yet, although the majority opinion submits that its approach will expand the privacy interests of New Jersey's residents, it instead will have the unintended consequence of leading to the impoundment of more vehicles and to a greater deprivation of the liberty interests of our citizens while also impairing the immediate investigation of suspected crimes.

## II.

Our state-law jurisprudence has not provided a compelling, much less persuasive, reason to depart from the automobile excep-

---

[3] In *Pennsylvania v. Labron*, a majority of the United States Supreme Court held that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the [automobile exception of the] Fourth Amendment thus permits police to search the vehicle without more." 518 *U.S.* 938, 940, 116 *S.Ct.* 2485, 2487, 135 *L.Ed.*2d 1031, 1036 (1996). Justices Stevens and Ginsburg did not disagree with the majority's reasoning, but dissented only because they believed that the Pennsylvania Supreme Court's decision, which the majority reversed, was based on "the Pennsylvania court's independent consideration of its own Constitution." *Id.* at 941–42, 116 *S.Ct.* at 2487–88, 135 *L.Ed.*2d at 1036–37 (Stevens, J., dissenting).

In *Maryland v. Dyson*, the Court affirmed *Labron* by holding that the federal automobile exception "does not have a separate exigency requirement." 527 *U.S.* 465, 467, 119 *S.Ct.* 2013, 2014, 144 *L.Ed.*2d 442, 445 (1999). Although dissenting from the majority's summary reversal, Justices Breyer and Stevens nonetheless "agree[d] that the Court's *per curiam* opinion correctly states the law." *Id.* at 468, 119 *S.Ct.* at 2014, 144 *L.Ed.*2d at 446 (Breyer, J., dissenting).

tion to the warrant requirement. Currently, to justify a search at the scene of an automobile stop, our Court requires that, in addition to probable cause, the police officer have exigent circumstances to conduct a warrantless search. *See State v. Cooke*, 163 *N.J.* 657, 661, 671, 751 *A.*2d 92 (2000). However, a review of our case law reveals that our Court has displayed an unwillingness, or inability, to live with the consequences of a *true* exigent-circumstances standard. In case after case, to rescue a search from the reach of the exclusionary rule, our Court has managed to find exigent circumstances in the most unremarkable circumstances. In my view, it is better to honestly apply the automobile exception to the warrant requirement than to resort to fictional exigencies to justify upholding the constitutionality of a search.

At least as of 1981, this Court interpreted the automobile exception to the warrant requirement under Article I, Paragraph 7 of our State Constitution no differently from the federal interpretation of the automobile exception under the Fourth Amendment. In *State v. Alston*, we upheld the constitutionality of the police search of the defendant's car based on the traditional automobile exception to the warrant requirement. 88 *N.J.* 211, 235, 440 *A.*2d 1311 (1981). We explained that "our decision in [*State v. Ercolano*, 79 *N.J.* 25, 397 *A.*2d 1062 (1979) ] in no way mark[ed] a departure from the established analysis of the [automobile] exception as recognized in *Carroll* and *Chambers*." *Id.* at 233, 440 *A.*2d 1311. Indeed, relying on *Chambers*, we noted that "the exigent circumstances that justify the invocation of the automobile exception are the unforeseeability and spontaneity of the circumstances giving rise to probable cause, and the inherent mobility of the automobile stopped on the highway." *Ibid.* (citing *Chambers, supra,* 399 *U.S.* at 50–51, 90 *S.Ct.* at 1980–81, 26 *L.Ed.*2d at 428). On that basis, it was permissible to conduct a search at the place of the stop rather than impound the vehicle for the purpose of securing a search warrant. *Id.* at 233–35, 440 *A.*2d 1311.

In *State v. Martin*, decided the same day as *Alston*, the Court again—under the banner of the automobile exception—aligned our jurisprudence, seemingly, with federal law and upheld the warrantless search of a station wagon suspected of being involved in a store robbery. 87 *N.J.* 561, 563–64, 436 *A.*2d 96 (1981). However, in *Martin*, the Court framed the issue as "the level of exigent circumstances sufficient to justify a warrantless search . . . under the automobile exception to the Warrant Clause." *Id.* at 563, 436 *A.*2d 96. In doing so, the Court focused on the "urgent, immediate need" requiring impoundment of the station wagon and warrantless search of the vehicle at police headquarters: the defendants, who were armed and dangerous, were "still at large," and aware that police suspected their involvement in the armed robbery. *Id.* at 569–70, 436 *A.*2d 96. The Court's decision was largely informed by its perceived understanding of federal constitutional law. *Id.* at 568–70, 436 *A.*2d 96 (citing *Chambers, supra,* 399 *U.S.* at 50–52, 90 *S.Ct.* at 1980–81, 26 *L.Ed.*2d at 428–29).

Nevertheless, the Court did not explain what "exigent circumstances" or "urgent, immediate need" justified not obtaining a search warrant once the vehicle was safely removed to headquarters. Nor did the Court explain the "exigent circumstances" that compelled law enforcement to leave the scene instead of staking out the vehicle if it was believed the robbers would return to the instrumentality of a crime.

In *State v. Colvin*, the Court, again believing that it had "harmonized [its] search-and-seizure law with Supreme Court precedent," upheld the warrantless search of a drug suspect's parked car. 123 *N.J.* 428, 437, 587 *A.*2d 1278 (1991). Shortly after the suspect's arrest, an informant advised the police that drugs were stashed in the suspect's car "and that other people knew about the arrest and would attempt to remove the drugs from the car." *Id.* at 430, 587 *A.*2d 1278. The "police entered the unlocked car, searched it, and found tinfoil packets of cocaine underneath the dashboard." *Ibid.*

Although using the automobile-exception nomenclature to justify the search, the Court spoke in terms of exigent circumstances, noting that the police had lost the element of surprise, confederates might remove the contraband from the car, and a special detail would be needed to guard the vehicle while a warrant was procured. *Id.* at 434–35, 587 *A.2d* 1278 (citing *Coolidge v. New Hampshire*, 403 *U.S.* 443, 462, 91 *S.Ct.* 2022, 2036, 29 *L.Ed.2d* 564, 580 (1971)). Despite its avowed adherence to the automobile exception under federal law, the Court concluded with a pure exigent-circumstances analysis, finding that

[t]he justification to conduct a warrantless automobile search does not turn on whether the vehicle is parked or moving. *The justification turns on the circumstances that make it impracticable to obtain a warrant when the police have probable cause to search the car.* When, as here, the police have no advance knowledge of the events to unfold, no warrant is required to search a parked car if the police have probable cause to believe that the car contains criminal contraband *and* have articulable reasons to search the vehicle immediately to prevent the loss or destruction of the evidence.

[*Id.* at 437, 587 *A.2d* 1278 (emphasis added).]

*Colvin* did not express an intent to break with federal law but, in its exigent-circumstances analysis, it nevertheless laid the seeds for the overthrow of the automobile exception as articulated as recently as in *Alston, supra.*

The final blow to the automobile exception was struck in *Cooke, supra.* There, the Court had to confront head-on the United States Supreme Court's decision in *Pennsylvania v. Labron,* which held that a separate finding of exigent circumstances was not a component of the Fourth Amendment's automobile exception. *See Cooke, supra,* 163 *N.J.* at 661, 751 *A.2d* 92 (discussing *Pennsylvania v. Labron,* 518 *U.S.* 938, 116 *S.Ct.* 2485, 135 *L.Ed.2d* 1031 (1996)). Until *Cooke,* as shown, the Court believed it had been following the federal standard.

In *Cooke,* for the first time, this Court explicitly departed from the Federal Constitution's automobile-exception jurisprudence and decreed that Article I, Paragraph 7 of our State Constitution required exigent circumstances before law enforcement officers, armed with probable cause, could undertake the warrantless

search of a car. *Id.* at 661, 671, 751 *A.2d* 92. In that case, in upholding the constitutionality of the search, the Court found exigent circumstances, but a close look at the facts suggests that there was no emergency that made it impracticable to secure a warrant.

While conducting surveillance, a police officer observed the defendant, after engaging in a drug transaction with another individual, place suspected drugs in a Ford Escort. *Id.* at 662, 751 *A.2d* 92. The defendant and the other individual drove off in another car, but were stopped by police officers serving as a perimeter team. *Ibid.* Those officers took from the defendant his keys to the Escort and conducted an on-scene search of the car, which uncovered illicit drugs. *Id.* at 663, 751 *A.2d* 92.

To reach its exigent-circumstances conclusion, the Court came to a number of findings either not supported by the evidence or irrelevant to the case: "it would have been impracticable to require" the officer conducting surveillance to leave his post to guard the Escort; "the element of surprise was lost" because of the defendant's arrest; "third parties had knowledge of the location of the Escort" and the stored drugs and "could have attempted to remove or destroy the drugs in the time necessary to obtain the warrant"; and "other parties in this known drug-trafficking area could have removed the car itself." *Id.* at 675, 751 *A.2d* 92.

Why were those findings unsupported by the evidence or irrelevant? The surveillance officer did not have to leave his post because he had a view of the Escort and could have alerted the officers on the perimeter team if confederates sought access to the Escort. Ordinarily, the police attempt to apprehend as many of the culprits involved in an illicit scheme. Here, the Court is suggesting—without any apparent basis—that the police needed to take flight out of fear that the confederates would arrive on the scene. More importantly, for purposes of the exigent-circumstances analysis, because the Escort was used as the instrumentality in a crime, it was obvious that it would be impounded and

taken to police headquarters. Once the car was removed from the scene, no exigency required forgoing the warrant procedure.

Under the automobile exception set forth in *Alston, supra,* the search clearly would have been permissible because of the "unforeseeability and spontaneity of the circumstances giving rise to probable cause." *Alston, supra,* 88 *N.J.* at 233, 440 *A.*2d 1311. However, the Court eschewed that standard for a pure exigent-circumstances test, relying, in large part, on *Colvin* as precedent. *See Cooke, supra,* 163 *N.J.* at 667–76, 751 *A.*2d 92. As revealed, the Court resorted to fictional exigencies to justify the search. The totality-of-the-circumstances standard the Court enunciated, moreover, has become so open-ended that our trial and appellate courts can reach almost any desired result in determining the constitutionality of a search under state law.

That brings us to the cases now before this Court.

### III.

In *Pena–Flores,* at approximately 11:00 p.m., a police officer stopped a car, which had dark-tinted windows, for a motor vehicle violation in Cranford. When the officer approached the driver's window, he smelled the strong odor of raw marijuana. The officer directed the driver to step from the vehicle. When a back-up police officer arrived on the scene, the passenger also was removed from the car. Without first securing a warrant, one of the officers entered the vehicle and conducted a search, uncovering a substantial amount of drugs and a handgun. Both the driver and passenger were charged with committing various drug and gun offenses. At a pretrial hearing, the trial court found no exigent circumstances justifying the search and suppressed all the evidence that the police discovered in the car, except two bags of marijuana that were retrieved from the passenger-side floor. The Appellate Division, also finding no exigency for the search, upheld the trial court's decision.

The majority, however, now reverses *Pena–Flores,* finding exigent circumstances because "[t]he ratio of police officers to sus-

pects was two-to-two, and there was no available backup." *Ante* at 30, 965 *A.*2d at 129. But given the presence of probable cause based on the overwhelming smell of marijuana wafting from the car and the fact that the car ultimately was towed and impounded with just the two officers on the scene, it is difficult to discern the exigent circumstances for not securing a search warrant when the car was going to be impounded in any event.

In *Fuller*, in the afternoon, a state trooper stopped a car driven by the defendant for a motor vehicle violation in Camden. The defendant handed the trooper a driver's license, which identified him as Charles Bradley and which contained a photograph that did not resemble the defendant. The trooper also quickly determined that the license plate and the bill of sale tendered by the defendant did not correspond to the car that the defendant was driving. The officer noticed traffic summonses on the backseat of the car, which the defendant then gave to the officer. Those summonses were issued to a Charles Bradley, which the officer soon learned from dispatch was an alias for the defendant. A pat-down of the defendant uncovered two large bundles of money in the side pocket of his pants.

With the aid of another trooper who arrived on the scene, a warrantless search was conducted of the car, revealing a gun wedged between the console and driver's seat and, in the console, bottles of Xanax without a proper prescription. A further search of the car disclosed marijuana in a dashboard compartment and underneath the backseat, where a sword also was hidden. The trial court denied the motion to suppress, but the Appellate Division reversed, finding no exigent circumstances for the search.

The majority, however, upheld the search of the handgun and the bottles of Xanax because the trooper discovered them inadvertently while looking for evidence of the car's ownership. *Ante* at 31, 965 *A.*2d at 129. However, before entering the car for the purported purpose of looking for registration or other proof of ownership, the trooper already had probable cause to arrest the defendant for possession of a stolen car, and, as in *Pena–Flores*, a

justifiable basis to impound the car, which ultimately was towed from the scene. Therefore, under the majority's exigency standard, the search could have been postponed until after the car was impounded at which time the troopers could have secured a warrant.

To inform the exigent-circumstances analysis in an automobile-stop case, which it applied in *Pena–Flores* and *Fuller*, the majority set forth a number of factors to be considered, such as

the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not, whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk.

[*Ante* at 29, 965 *A*.2d at 128.]

That multi-factor test will lead to widely divergent outcomes and allow trial courts and appellate courts routinely to second-guess the officers on the scene and eventually themselves. It is asking too much of law enforcement officers, who are responding to fast-moving and -evolving events, to process the type of complex and speculative information contained in that formula and expect uniform and consistent decision-making. In the above exigent-circumstances analysis, for a permissible automobile search, what is the acceptable ratio of officers to suspects, what should the officer know about the neighborhood, how is he to know if confederates are skulking about, and what does it mean to consider leaving the car unguarded when the car can be safely towed and impounded? The exigent-circumstances formula expounded by the majority will leave many police officers with an unwillingness to hazard a guess, fearing that a mistaken decision will result in the suppression of critical evidence. Thus, in many cases, the prudent police officer will impound the vehicle and later secure a warrant. For those who venture to use the formula, our courts will be kept busy for years ironing out the meaning and application of its various components.

Society pays an exorbitant price when otherwise relevant evidence is suppressed not because police officers have acted in flagrant violation of the law, but rather because they erred while attempting to follow judicially-imposed rules too difficult for the average officer or constitutional scholar to understand. Moreover, as explained earlier, I do not believe the regime adopted by the majority expands the privacy and liberty interests of the people under Article I, Paragraph 7. That is probably the reason why the majority of jurisdictions have not taken the road the majority continues to traverse. *See Commonwealth v. Rosenfelt*, 443 *Pa.Super.* 616, 638, 662 *A.*2d 1131 (1995), *appeal denied*, 544 *Pa.* 605, 674 *A.*2d 1070 (1996) (collecting cases); *see also* 3 Wayne R. LaFave, *Search and Seizure* § 7.2(b), at 557 n. 79 (4th ed. 2007) (same).

Under the *Alston* automobile-warrant exception, the search of the vehicles in both *Pena–Flores* and *Fuller* would have been constitutional because the "unforeseeability and spontaneity of the circumstances [gave] rise to probable cause." *Alston, supra,* 88 *N.J.* at 233, 440 *A.*2d 1311. Let me be clear that I do not fully subscribe to the current federal doctrine, which does not set forth an "unforeseeability and spontaneity" requirement. The standard articulated in *Alston* provides greater protection to the people of New Jersey than the United States Supreme Court's decision in *Labron, supra,* and to that extent I would depart from the federal standard under Article I, Paragraph 7 of our State Constitution. Police officers who know in advance that there is contraband in a car and have sufficient time to obtain a search warrant should do so. The Attorney General conceded that law enforcement could work effectively with that standard.

IV.

Through the passage of time and benefit of hindsight, experience reveals that sometimes a state's highest court, or even the highest court in the land, has made a mistake, however well-meaning the original intention. The United States Supreme

Court, as well as this Court, has acknowledged that *stare decisis* is not a compelling reason to uphold an erroneous or improvident interpretation of law. *Stare decisis*, surely, furthers the important purpose of according respect "to the judgments of the Court and to the stability of the law," but "[i]t is not ... an inexorable command." *Lawrence v. Texas*, 539 *U.S.* 558, 577, 123 *S.Ct.* 2472, 2483, 156 *L.Ed.*2d 508, 525 (2003) (reversing seventeen-year precedent that interfered with liberty interests of homosexuals to engage in certain sexual conduct); *see also Payne v. Tennessee*, 501 *U.S.* 808, 828, 111 *S.Ct.* 2597, 2609, 115 *L.Ed.*2d 720, 737 (1991) ("*Stare decisis* is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision." (citation and internal quotation marks omitted)).

Likewise, New Jersey courts have not viewed the doctrine of *stare decisis* as a straitjacket preventing us from making appropriate and necessary course corrections to our law. Chief Justice Vanderbilt recognized in his dissent in *Fox v. Snow*: "The doctrine of *stare decisis* [does not] render[ ] the courts impotent to correct their past errors. . . . The doctrine when properly applied operates only to control change, not to prevent it." 6 *N.J.* 12, 23, 76 *A.*2d 877 (1950) (Vanderbilt, C.J., dissenting); *see also White v. Twp. of N. Bergen*, 77 *N.J.* 538, 550–52, 391 *A.*2d 911 (1978) (noting acceptance of "Vanderbilt thesis"). We re-heard arguments in the cases before us to grapple with the underlying rationale of the current law controlling automobile searches. *Stare decisis* should not be a sufficient basis for staying our hand from taking corrective action.

## V.

In conclusion, I believe that the majority, while faithfully following precedent, perpetuates and expands an exigent-circumstances standard that will continue to confound law enforcement and our courts. We should not continue with a failed and unrealistic policy governing automobile-search cases. If there was some compen-

sating benefit to the majority's approach—a true extension of privacy and liberty interests under Article I, Paragraph 7, despite the negative impact on law enforcement—that might be a worthwhile approach. But, in the end, it is better to have a *real* standard that can be genuinely applied to achieve uniform results than a standard that pretends to give greater rights to the people when, in fact, it is likely to weaken our citizens' rights and unnecessarily impede law enforcement in performing its duties.

Therefore, I respectfully dissent.

*For reversal and remandment*—Justices LONG, LaVECCHIA, WALLACE; and HOENS—4.

*For affirmance*—Chief Justice RABNER and Justices ALBIN and RIVERA-SOTO—3.

*For affirmance in part, reversal in part, and remandment*—Justices LONG, LaVECCHIA, WALLACE, and HOENS—4.

*For Dissent*—Chief Justice RABNER and Justices ALBIN and RIVERA-SOTO—3.