Justice LaVECCHIA,
dissenting.
Persistence has paid off.
This is not the first time that the State has sought to have the decision in State v. Pena-Flores, 198 N.J. 6, 965 A.2d 114 (2009), revisited and overturned. Pena-Flores reaffirmed State v. Cooke, 163 N.J. 657, 751 A.2d 92 (2000), which held that our state constitutional law requires that exigency remain part of the analysis when reviewing law enforcement’s purported justification for searching a car in New Jersey without a warrant authorized by a neutral magistrate. Both cases held that exigency is a necessary component for a warrantless search of a ear stopped roadside anywhere in New Jersey — in the suburbs, on a city street, in a parking lot, or on the highways and rural byways of New Jersey. The State does not want to have to show exigency. It wants a relatively automatic exception to the general warrant requirement when it comes to cars, so long as the police encounter leading to the search is spontaneous and unforeseen. But that argument was rejected in both Pena-Flores and Cooke. Hence this persistence in having those decisions revisited.
The State brought petitions for certification raising the issue several times. The issue was certified as an appeal for the State in State v. Deshazo, 208 N.J. 370, 29 A.3d 742 (2011), and again in State v. Crooms, 208 N.J. 371, 29 A.3d 743 (2011). Those appeals were consolidated with the State’s appeal in State v. Shannon, 208 N.J. 381, 30 A.3d 318 (2011), and the cluster were dismissed, collectively, as improvidently granted in an Order carrying a lead caption from State v. Shannon, 210 N.J. 225, 43 A.3d 1146 (2012).
Our Order in Shannon reminded the State of its burden to show special justification when seeking to upend settled law. Id. at 226-27, 43 A.3d 1146. We found no support in the Shannon record for the special-justification finding essential for the Court to consider departing from standing precedent. Id. at 227, 43 A.3d 1146. We took the remarkable step in Shannon of identify *452 ing the type of record that the State would have to present to support its requested overturning of decided case law protective of citizens’ constitutional right to be free from warrantless searches of their vehicles. Id. at 227-28, 43 A.3d 1146.
Now the State, through the Attorney General, is back again asking that Penar-Flores be overturned. I still find no special justification to support the dramatic action the State would have this Court take. Let me be clear as to what the State seeks and what I decline to do: I would not overturn Pena-Flores and Cooke and the three decades of precedent on which those decisions rely.
The Court’s decision today represents a radical change in our jurisprudence. It lessens the protection from warrantless searches of automobiles that New Jersey historically has provided.
The majority adopts an automobile exception that rejects the need to show that exigency makes impracticable obtaining a warrant issued by a neutral magistrate. The majority says that determining exigency is just too difficult — notwithstanding that police frequently are called on to make exigency determinations in search settings[1] — and decrees that there no longer will be any requirement of demonstrating exigency for roadside searches of stopped vehicles occurring anywhere in the State of New Jersey. By eliminating the exigency requirement, the majority mimics the federal standard — a question we were forced to confront in Cooke and which we as a Court rejected as constitutionally insufficient in this State.
The State has not won because it has proved special justification. It has failed in that showing. Indeed, the State’s argument demonstrates seeming recognition of that failure by shifting from attempting to prove that obtaining telephonic warrants is imprac *453 tieable to a new worry about a self-created “problem” associated with an increase in roadside consent searches. Instead of asking people for consent, the Attorney General wants this Court to simply allow searches of cars roadside based on an officer’s unreviewed belief that probable cause exists. Further, although the State can create a program under which troopers on the road wear body cameras,[2] it for some reason cannot obtain telephonic warrants, despite the fact that telephonic warrants are used in many other settings. And a majority of our present Court now accepts those arguments.
This is not a proud day in the history of this Court. Through perseverance in seeking the reversal of a disliked decision with which the State made desultory, if any, effort to comply, the Attorney General has been rewarded on the basis of a wholly inadequate and unpersuasive record. Indeed, that reward is a direct result of the Attorney General’s persistence leading to a majority now willing to effect this jurisprudential change.
Ironically, the majority takes this step at a time when federal jurisprudence is veering away from any per se categories of assumed exigency. The arc of history may prove embarrassing indeed for my colleagues in the majority. I must respectfully and vigorously dissent. In my view, stare decisis should prevail.
I.
Stare decisis is the presumed course because it “ensure[s] that the law will not merely change erratically, but will develop in a principled and intelligible fashion[,] ... [and because it] permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals.” Vasquez v. Hillery, *454 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598, 610 (1986). “Stare decisis ‘carries such persuasive force that we have always required a departure from precedent to be supported by some special justification.’ ” Luchejko v. City of Hoboken, 207 N.J. 191, 208, 23 A.3d 912 (2011) (quoting State v. Brown, 190 N.J. 144,157, 919 A.2d 107 (2007)). When determining whether stare decisis must yield, relevant considerations include “whether the prior decision is unsound in principle[] [or] unworkable in practice.” Shannon, supra, 210 N.J. at 227, 43 A.3d 1146 (citation omitted).
As to the first consideration, the majority fashions a revisionist view of prior law to conclude that Pena-Flores and Cooke were unsound in principle. The majority’s sweeping review of that prior jurisprudence is unsurprising; its outline was set forth in the dissent to Penar-Flores and became the State’s mantra. That drumbeat to undo decades of case law has led to the crescendo of reversal accomplished today. However, the history of our jurisprudence requires another, more discerning look to fully appreciate what the majority does here. Thus, I will turn first to the assertion that Cooke, and necessarily Pena-Flores, are “unsound in principle.” Second, I will address the State’s failure to carry its burden to demonstrate that our current law is “unworkable in practice.”
II.
In Cooke, this Court dealt directly with the question of the role of exigency in automobile searches — a question this Court was required to answer following the United States Supreme Court’s decision in Pennsylvania v. Labron, 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (per curiam). In Labron, the Court rejected an interpretation of the Fourth Amendment that would necessitate a demonstration of the presence of exigent circumstances before officers conducted an automobile search under the federal automobile exception to the general warrant requirement. Id. at 938-40, 116 S.Ct. at 2486, 135 L.Ed.2d at 1035-36. The Supreme Court held that “[i]f a car is readily mobile and probable *455 cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.” Id. at 940, 116 S.Ct. at 2487, 135 L.Ed.2d at 1036 (citation omitted); see also Maryland v. Dyson, 527 U.S. 465, 466, 119 S.Ct. 2013, 2014, 144 L.Ed.2d 442, 445 (1999) (per curiam) (confirming that “the ‘automobile exception’ has no separate exigency requirement”).
“In view of those recent federal holdings,” this Court said in Cooke, supra, that we were forced to “decide whether the automobile exception requires a finding of exigent circumstances under the New Jersey Constitution.” 163 N.J. at 666, 751 A.2d 92 (emphasis added). Based on our jurisprudence, we answered that question in the affirmative; for purposes of our own state constitutional analysis, we rejected adoption of the Labron Court’s elimination of an exigent-circumstances component under the federal automobile exception. Id. at 670, 751 A.2d 92.
In reaching that decision, this Court noted that it “has repeatedly looked to exigent circumstances to justify warrantless automobile searches.” Id. at 667, 751 A.2d 92 (citing State v. Colvin, 123 N.J. 428, 429, 587 A.2d 1278 (1991); State v. Esteves, 93 N.J. 498, 504, 461 A.2d 1128 (1983); State v. Alston, 88 N.J. 211, 233, 440 A.2d 1311 (1981); State v. Martin, 87 N.J. 561, 569, 436 A.2d 96 (1981); State v. Patino, 83 N.J. 1, 9, 414 A.2d 1327 (1980); State v. LaPorte, 62 N.J. 312, 316, 301 A.2d 146 (1973)). To substantiate that statement, the Court provided a detailed discussion of three cases: “In prior cases, such as Alston, Martin, and LaPorte, we held that the warrantless automobile searches were reasonable only because they were supported by probable cause and exigent or emergent circumstances.” Id. at 668, 751 A.2d 92 (emphasis added).
Alston, supra, involved police pursuit of a speeding vehicle during which the officers noticed that the vehicle’s occupants were acting furtively in an apparent attempt to conceal something. 88 N.J. at 216, 440 A.2d 1311. Once stopped, police requested credentials. Ibid. When one occupant opened the glove compart *456 ment to retrieve those credentials, police observed shotgun ammunition. Ibid. The vehicle’s occupants were instructed to exit the vehicle and were frisked, but no weapons were found on them. Ibid. However, police observed a bag protruding from underneath the front passenger seat, concealing what the detective determined to be a shotgun. Id. at 216-17, 440 A.2d 1311. After the suspects were arrested based on the shotgun and ammunition already found, a further search yielded two additional weapons. Id. at 217, 440 A.2d 1311. This Court upheld the extended search, “finding] that under the circumstances of th[e] case the detectives had probable cause to conduct the search of the passenger compartment that revealed the two [additional weapons],” id. at 232, 440 A.2d 1311, and that “the exigent circumstances that justify the invocation of the automobile exception are the unforeseeability and spontaneity of the circumstances giving rise to probable cause and the inherent mobility of the automobile stopped on the highway,” id. at 233, 440 A.2d 1311 (citation omitted).
As the Cooke Court emphasized, “[w]e upheld the search [in Alston ] because the events leading up to the search were spontaneous and unforeseeable, and posed a potential threat to officer safety. Thus, there were exigent circumstances to justify the warrantless search.” Cooke, supra, 163 N.J. at 668, 751 A.2d 92 (emphasis added) (internal citation omitted) (citing Alston, supra, 88 N.J. at 234, 440 A.2d 1311).
In Martin, supra, decided the same day as Alston, our Court upheld the warrantless search of a vehicle at a police station. 87 N.J. at 570-71, 436 A.2d 96. In that case, officers were investigating a “freshly-committed armed robbery” and were provided with a description of an automobile believed to be operated by the perpetrators of that robbery. See id. at 563, 436 A.2d 96. Officers located a vehicle matching the given description, conducted a brief search and credentials check, and allowed the ear to proceed on its way. Id. at 564-65, 436 A.2d 96. However, at supervisor direction, officers re-located the now-unoccupied vehicle in a housing project parking lot. Id. at 565, 436 A.2d 96. The vehicle was *457 identified by two witnesses as the vehicle associated with the armed robbery and was brought to the police station and searched, revealing incriminating evidence of the robbery under investigation. Ibid. In finding the warrantless search constitutionally permissible, and that it would have been dangerous for the officers to have conducted it at the parking lot where the vehicle was found, this Court noted:
The occupants of the car, the suspected robbers, were still at large. Because the police had stopped the car, the occupants were alerted that they might have been suspected of involvement in the armed robbery. They might have returned at any moment to move the car or remove the car’s contents. In addition, the officers had reason to believe that the occupants of the station wagon were not only alerted but also armed and dangerous. The illumination in the parking lot where the vehicle was discovered at that early morning horn- was dim at best. In view of the possibility of the suspects’ return to the ear, “[a] careful search at that point was impractical and perhaps not safe for the officers____”
[Id. at 569-70, 436 A.2d 96 (alteration in original) (citations omitted).]
The Court also emphasized the ongoing nature of the investigation of the nearby armed robbery, which heightened the level of exigency, noting that it created “an urgent, immediate need for the police to ascertain whether the car contained evidence of the armed robbery, before the suspects had an opportunity to leave the area or to destroy or dispose of other evidence.” Id. at 570, 436 A.2d 96 (citation omitted).
In Cooke, supra, the Court quoted in full the above passage from Martin, preceding that quote with the following: “Finding exigent circumstances, we upheld the warrantless search in Martin.” 163 N.J. at 669, 751 A.2d 92 (emphasis added). The Cooke Court also highlighted the “ ‘urgent, immediate need’ ” identified by the Martin Court. Ibid, (quoting Martin, supra, 87 N.J. at 570, 436 A.2d 96).
In LaPorte, supra, the defendant contended that the warrant-less search of his automobile at police headquarters, following his arrest for armed robbery, was illegal. 62 N.J. at 316, 301 A.2d 146. The Court rejected the defendant’s argument, specifically noting that the “vehicle was mobile,” that “[h]ad the police not seized [the vehicle] it might have been moved and whatever *458 evidence it contained lost,” that the defendant’s “ex-wife had a duplicate key to the car and drove it quite a bit,” and that “it was not practicable to secure a warrant.” Id. at 317, 301 A.2d 146. According to the Cooke Court, “the circumstances [in LaPorte] made it impracticable for the police to procure a search warrant and immediate action was necessary.” Cooke, supra, 163 N.J. at 670, 751 A.2d 92 (citing LaPorte, supra, 62 N.J. at 316, 301 A.2d 146).
In discussing each of those cases — Alston, Martin, and LaPorte — the unanimous Cooke Court pointed out the factual features that presented exigency: reasons associated with either police safety or prevention of loss or destruction of evidence. Id. at 668, 669, 670, 751 A.2d 92. Such considerations were highlighted as essential parts of this Court’s past holdings supporting warrantless searches of automobiles. See ibid.
Following its review of those as well as other past decisions,[3] the Court in Cooke stated:
In view of our unwavering precedent and the important rights at stake, we see no need to modify our jurisprudence. Stated differently, the State has provided no compelling basis for us to curtail or eliminate those standards that for decades have served the criminal justice system, and served it well, balancing constitutional guarantees against the need for effective law enforcement____
[T]he lessened privacy expectation is one factor, which, when combined with the existence of probable cause and the overall exigency of the situation, may justify [a] warrantless search.
[7d at 670, 751 A.2d 92 (emphasis added) (citations omitted).]
Then, in Pena-Flores, supra, this Court “reaffirm[ed] our longstanding precedent that permits an automobile search without a *459 warrant only in eases in which the police have both probable cause to believe that the vehicle contains evidence and exigent circumstances that would justify dispensing with the warrant requirement.” 198 N.J. at 11, 965 A.2d 114. The Pena-Flores Court again engaged in a detailed discussion of the case law leading up to Cooke, id. at 20-24, 965 A.2d 114 — which the Pena-Flores Court reminded us “affirmed that the exigency inquiry has always been a part of New Jersey’s automobile exception,” id. at 25-26, 965 A.2d 114 (citing Cooke, supra, 163 N.J. at 667, 670-71, 751 A.2d 92) — and emphasized how this Court, unlike the federal courts, has always assessed exigency on a case-by-case basis, rather than solely on the inherent mobility of the automobile, id. at 21, 965 A.2d 114.
The Pena-Flores Court highlighted LaPorte as the first indication that, unlike the developing federal law, specific facts create exigency, not the mere mobility of the vehicle. Ibid. It then discussed Alston, noting that the Court’s holding in that case “essentially added a requirement that is not part of the federal automobile standard,” namely, that “the stop and search of the vehicle cannot be pre-planned — it must be unforeseen and spontaneous.” Ibid, (citing Alston, supra, 88 N.J. at 233-34, 440 A.2d 1311). However, that language did not supplant the separate exigency aspects of the analysis. Discussing the Martin Court’s exposition of facts that created the exigency in that case, the Pena-Flores majority stated: “Obviously, there would have been no need to detail the facts and circumstances that created the exigency had the mere mobility of the vehicle sufficed.” Id. at 22, 965 A.2d 114. The Pena-Flores Court noted that “together Alston and Martin rejected the federal standard by declaring (1) that the stop had to be unforeseen and spontaneous and (2) that exigency must be assessed based on the particular facts and circumstances of the ease, and does not automatically flow from the mobility of the vehicle.” Ibid, (emphasis added).
Following a discussion of Cooke and the consistency of our past precedent, the Pena-Flores Court held that “the warrantless *460 search of an automobile in New Jersey is permissible where (1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant.” Id. at 28, 965 A.2d 114 (citations omitted). The Court then provided a list of examples of considerations that may be pertinent when assessing exigent circumstances. Id. at 29, 965 A.2d 114.
Penar-Flores and Cooke are soundly reasoned and fully supported decisions. Their reasoning tracks carefully the factual bases and legal reasoning for the holdings of earlier precedent. For the majority to pronounce them unsound in principle, ante at 447, 126 A.3d at 872, is unfair. That pronouncement reflects only the majority’s own contrary view of earlier law. In particular, I note the majority’s canonization of Alston as the preeminent word on the automobile exception in New Jersey. The majority has distilled Alston to a single-sentence standard that conveniently ignores Alston’s own acknowledgment (and Pena-Fiares’s underscoring) of the presence of exigency in the circumstances, independent of the spontaneity and unforeseen nature of the roadside encounter. The Pena-Flores dissent was not persuasive on this point. Its repetition in the majority’s opinion does not enhance it.
Indeed, the majority does not deal squarely with Pena-Flores either, miseharacterizing it as having established an unworkable multi-factor test, ante at 414-15, 444, 126 A.3d at 853, 871, notwithstanding the Pena-Flores Court’s immediate and solid rejection of that same assertion when it first was advanced as a dissenter’s complaint, see Pena-Flores, supra, 198 N.J. at 29 n. 6, 965 A.2d 114. That point, and others, require separate attention in my response to the second reason advanced by the majority for overturning both Pena-Flores and Cooke — namely, that they are unworkable in practice. However, let it be said that I dissent from the reasoning and holding of the majority that Pena-Flores and Cooke are unsound in principle.
*461 III.
The State contends that Pena-Flores is “unworkable in practice” for two principal reasons: first, that a post-Pena-Flores pilot program has exposed practical difficulties with roadside telephonic search warrants; and second, that Penar-Flores has produced the “unintended negative consequences” of increasing consent-based searches and expanding police discretion. In reality, however, the so-called evidence of the practical difficulties with obtaining roadside telephonic warrants is derived from a single six-month pilot program that ended three years ago and whose results are arguably promising, and at worst inconclusive. Further, the State’s arguments regarding unintended and supposedly negative consequences of Pena-Flores are comprised of speculation and leaps in logic, and are not borne out by the State’s own data. In sum, the State falls far short of demonstrating its heavy burden that Pena-Flores is unworkable in practice and that stare decisis must yield.
A.
In Pena-Flores, supra, the Court recognized a need for “an efficient and speedy electronic and telephonic warrant procedure that will be available to [police] on the scene[,] ... obviate the need for difficult exigency assessments^] and ... guarantee our citizens the protections that the warrant requirement affords — an evaluation of probable cause by a neutral judicial officer.” 198 N.J. at 36, 965 A.2d 114. To that end, the Pena-Flores Court ordered the creation of a task force “to address the practical issues involved in obtaining telephonic and electronic warrants.” Id. at 35, 965 A.2d 114. The task force was to “study ... telephonic and electronic warrant procedures and make practical suggestions to ensure that technology becomes a vibrant part of our process,” including “recommendations for uniform procedures (including forms), equipment, and training, along with an evaluation of the scheme once it is underway.” Id. at 35-36, 965 A.2d 114. The resulting Supreme Court Special Committee on Tele *462 phonic and Electronic Search Warrants (Special Committee) was formed and its findings culminated in a January 2010 report. Report of the Supreme Court Special Committee on Telephonic & Electronic Search Warrants (Jan. 22, 2010) [hereinafter Special Committee Report], available at http://www.judiciary.state.nj.us/ notices/2010/nl00520b.pdf. The Special Committee Report made detailed recommendations in respect of implementing a telephonic warrant program in New Jersey and set a goal of “no more than [forty-five] minutes, with an ideal goal of [thirty] minutes” for completing the telephonic warrant process. Id. at 19.
To test the viability of the Special Committee’s recommendations, as well as the potential volume of telephonic warrant requests, the Administrative Office of the Courts launched a six-month telephonic warrant pilot program in the Burlington Vicinage, which ran from September 6, 2011, through March 6, 2012. Superior Court of New Jersey, Burlington Vicinage, Telephonic Search Warrants (Penar-Flores) Pilot Program 3-4, 6 (2012) [hereinafter Pilot Program]. The State argues that the results of that pilot program demonstrate that Pena-Flores’s promotion of telephonic and electronic warrants is unworkable in practice. Specifically, the State points to the fact that the average amount of time it took to obtain a telephonic warrant during the pilot program was fifty-nine minutes, which exceeds the Special Committee Report’s goal of a maximum of forty-five minutes. (Citing Pilot Program, supra, at 6). On average, thirty-two of those minutes were the time it took for a police officer to connect with a judge on the phone, a process that was facilitated by the county prosecutor’s office via a central communications dispatch system. Pilot Program, supra, at 6. Focusing on that length of time in particular, the State asserts that the pilot program’s failure to meet its target time is attributable to “the human components of any telephonic warrant system,” especially the fact that “judges in this State are not like customer service representatives ... they are not standing by 24/7 to take calls from police and prosecutors.”
*463 Although the fifty-nine minute average time to obtain a warrant exceeded the Special Committee’s outer-limit target by fourteen minutes, that fact does not lead inevitably to the conclusion that a telephonic warrant program in New Jersey is impracticable. The Burlington Vicinage pilot program was just that: a pilot program, one goal of which was to test the initial recommendations.of the Special Committee Report. It was not a test by which the viability of telephonic warrants in New Jersey should decidedly pass or fail. See Special Committee Report, supra, at iv (“If the number of requests for telephonic search warrants exceeds the ability of the current emergent duty system to handle them, another system should be implemented as quickly as possible.”). By the State’s analysis, because the precise approach taken three years ago in a six-month pilot program exceeded its target time by fourteen minutes, telephonic warrants are impracticable.[4] That line of thinking ignores the fact that “the human components of any telephonic warrant system” are not static, but rather a function of the practices and procedures that human beings design and implement, as well as the will and energy they put into doing so.
Properly viewed, the pilot program and its results are a mere jumping off point for building a workable telephonic or electronic warrant system, or at least trying in earnest to do so. The State could have attempted to improve upon the pilot program’s approach in the three years since it concluded, but, significantly, it points to no evidence of having done so. The State also presents no evidence that improvement on the average time to obtain a *464 telephonic warrant was impossible or unlikely,[5] or that there was no way to adjust the pilot program to make it more convenient for all parties involved. To the contrary, it would seem that ongoing developments in technology make advances in efficiency more and more likely.
The fact that New Jersey already has functioning systems to telephonieally and electronically apply for and obtain temporary restraining orders (TROs) in several settings is strong evidence that telephonic or electronic warrants can work where there is a will to make them work. For example, as the ACLU points out, the judiciary and law enforcement have implemented an electronic filing system for TROs to protect victims of domestic violence, which “allows police to fill out an electronic form, teleconference with the judge, and print out the approved TRO in moments.” New Jersey Courts Annual Report 2007-2008, at 1, 17, available at http://www.judiciary.state.nj.us/pressrel/ARNJCourts08.pdf; see also R. 5:7A(b) (providing that domestic violence TRO may be issued “upon sworn oral testimony ... communicated to the judge by telephone, radio or other means of electronic communication”). Notably, “[o]n weekends, holidays and other times when the court is closed,” Family Part and municipal court judges “shall be assigned to accept complaints and issue emergency ... [TROs].” N.J.S.A 2C:25-28(a). Similarly, “[a] judge may issue an arrest warrant on sworn oral testimony communicated through telephone, radio or other means of electronic communication.” R. 3:2-3(b). Restraining orders for certain criminal offenders may also be issued through such telephonic or electronic communication. N.J.SA. 2C:35-5.7(a).
That other states have implemented telephonic and electronic warrant programs is further evidence that such a feat is possible where the will to do so exists. See Missouri v. McNeely, — U.S. *465 -,-, 133 S.Ct. 1552,1562,185 L.Ed.2d 696, 708 (2013) (“Well over a majority of States allow police officers or prosecutors to apply for search warrants remotely through various means, including telephonic or radio communication, electronic communication such as e-mail, and video conferencing.”). In Utah, with the introduction of an “e-warrant” system, “police officers can process a search warrant in five to 15 minutes. The police officer begins by texting the search warrant request directly to the judge on call who then reviews the search warrant online, electronically signs the warrant, and emails it back to the officer to serve.” State of Utah Judiciary, 2014 Annual Report to the Community 8 (2014), available at http://www.utcourts.gov/annualreporV2014-Courts Annuahpdf; see also Jason Bergreen, Judges, Cops Dote on Quicker Warrant System, Salt Lake Trib. (Dec. 29, 2008, 11:00 AM), http://archive.sltrib.com/article.php?id= 11309849&itype= NGPSID.
In Missouri, 2004 and 2010 amendments to that state’s “search warrant statute authoriz[e] search warrant applications to be made by electronic means and with electronic signatures!],] permitting] e-mail search warrants.” H. Morley Swingle & Lane P. Thomasson, Beam Me Up: Upgrading Search Warrants with Technology, 69 J. Mo. B. 16, 19 (2013). As of June 2012, thirteen percent of Missouri prosecutors’ offices had obtained search warrants via e-mail, and five more offices (4.3 percent) “had a process in place” to begin doing the same. Ibid. Missouri counties have incorporated “electronic means” into the warrant process in various and creative ways. Ibid. In Christian County, Missouri, a judge and prosecutor use iPads to sign e-mailed warrants using “a 99-cent signature application.” Ibid. “In Henry County, a streamlined process has been established” wherein an officer can e-mail a warrant application and affidavit to a prosecutor, who can sign it with a signature application and forward it to a judge. Id. at 20. The judge then can sign it using an application and e-mail it back to the officer, whose patrol car is equipped with a printer. Ibid. Finally, as of 2012, Platte County had a plan “to use Skype with its electronic search warrant process, so the judge, prosecu *466 tor and law enforcement officer can see each other by video conferencing while the warrants are being obtained.” Ibid, (footnote omitted).
Those efforts, and successes, in other states — as well as this State’s implementation of electronic and telephonic restraining orders and arrest warrants — demonstrate that the results of a single six-month pilot program using telephonic warrants cannot fairly be viewed as conclusive evidence of the impracticability of a telephonic or electronic search warrant program in New Jersey. That is particularly so given that the pilot program took place in 2011-2012. Technology already has evolved since then, and the efforts of other states indicate that there were, and are, many more methods to try for quickly procuring a warrant, including the use of e-mail, iPads and other mobile devices, and electronic signature applications. Technology cannot solve every issue, but consistent, concerted commitment to maximizing both technological and human resources can go a long way. A little creativity and dedication to resolving the challenges encountered during the pilot program may indeed have gone a long way. But the State’s seeming lack of resolve to make telephonic warrants a success cannot and does not prove their impracticability. As the ACLU aptly notes, the will to develop a workable telephonic or electronic warrant program must be derived from Article 1, Paragraph 7 of the New Jersey Constitution, and not from individual governmental actors.[6]
*467 B.
Seemingly recognizing that the results of the pilot program do not prove that telephonic warrants are impracticable — a burden that the State must bear to launch a frontal attack on precedent— the State turns to an alternative ground on which to conclude that Pena-Flores is unworkable. It asserts that Penar-Flores has produced the “unintended negative consequence” of increasing consent-based searches of automobiles. As proof that consent-based searches have increased as a result of Pena-Flores, the State points to a study conducted by the Office of Law Enforcement Professional Standards (OLEPS) on the effects of PenarFlores. Office of Law Enforcement Professional Standards, The Effects of Pena-Flores on Municipal Police Departments (Oct. 2012) [hereinafter 2012 OLEPS study], available at http://www.nj. gov/oag/oleps/pdfs/OLEPS-Report-Effects-ofPena-Flores-onMun-PDs-10.12.pdf. The study collected data from motor vehicle stops from a sampling of municipal police departments throughout the state — 103 of the approximately 550 New Jersey municipal police departments — as well as from the State Police during the month of April from 2008 (the year before the February 2009 Pena-Flores decision) through 2012. Id. at 2, 6.
The 2012 OLEPS study reveals that consent-based automobile searches increased in municipal police departments from a reported ninety-six in April 2008 to 271 in April 2012, while the overall number of stops remained relatively unchanged. Id. at 9,13. For the State Police, consent searches increased from nineteen in April 2008 before Pena-Flores to ninety-five in April 2009, just a few months after the Pena-Flores decision. Ibid. That number steadi *468 ly increased to 229 consent searches in April 2011. Ibid. The State highlights those increases in consent-based searches and characterizes them as a negative consequence of Pena-Flores. According to the State, the increase in consent searches is a negative effect because asking for consent to search may be coercive when probable cause is “so strong and obvious ... as to undermine the voluntariness of consent,” and when motorists feel that they will be subjected to prolonged detention unless they consent.
Although the voluntariness of consent is undoubtedly paramount, based on the record currently before the Court, the State’s argument on this front does not hold up. First, the 2012 OLEPS study itself characterizes consent-based searches as “a relatively rare occurrence,” despite the numerical increase in consent searches. 2012 OLEPS Study, supra, at 13. “Most departments had a handful [of consent searches] in the months selected for review.” Ibid. In fact, “conversations with local law enforcement officers” indicated that “consent requests [we]re not especially common,” a trend “the numbers reinforce.” Id. at 14. Specifically, the 2012 OLEPS study found that
[g]iven that there were 103 departments in the sample, on average there were only 1.07 consent searches granted per department for April 2008, 1.30 for April 2009, 1.85 for April 2010, 2.37 for April 2011, and 2.85 for April 2012. The total number of granted consent searches represents less than 1% of the number of motor vehicle stops reported. Consent requests then, do not occur with great frequency for municipal departments or the State Police.
{Ibid, (emphasis added).]
Importantly, a follow-up OLEPS study conducted in 2013 reiterated those findings and attributed an apparent increase in consent searches from 2012 to 2013 mostly to mere changes in reporting:
While the number of granted consent to search requests does increase by almost 100 stops from April 2012 to April 2013, this increase cannot be attributed, to increased use in consent requests. Instead, this increase is more likely to, at least in part, be affected by reporting rather than the true number of events. As a result of the 2012 data request, many departments improved their records of motor vehicle stops, to facilitate such data requests. Thus, while overall, there is a steady, but small, increase in the number of granted consent searches, the large increase for W1S, is not likely a true reflection of activity. *469 [Office of Law Enforcement Professional Standards, Second Report: The Effects of Pena-Flores on Municipal Police Departments 15 (Dec. 2013) (emphasis added), available at http:/Avww.nj.gov/lps/oleps/pdfs/OLEPS-Report-Bffects-of-PenaFlores-on-Mun-PDs-12.13.pdf.]
Second, the State does not demonstrate that the increase in consent-based searches is actually a negative consequence of Penar-Flores. Roadside consent searches of automobiles do not present a constitutional dilemma when there is “reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity,” State v. Carty, 170 N.J. 632, 647, 790 A.2d 903 (2002), and when consent is given voluntarily, see State v. Johnson, 68 N.J. 349, 353-54, 346 A.2d 66 (1975). It is entirely appropriate for law enforcement to simply ask a motorist for consent to search his or her car when probable cause develops before resorting to trying to obtain a warrant, telephonic or otherwise. Although courts must always be vigilant to claims of coerced or involuntary consent, the State has failed to produce any evidence that officers have been obtaining consent coercively or that there is great risk of such inappropriate behavior. In fact, at oral argument the State expressly represented that none of the consent-based searches recorded in the OLEPS study were found to be coercive to its knowledge. The State’s argument based on alleged negative aspects of consent searches is thus entirely speculative, a point repeatedly confirmed upon close examination of its discussion of that assertion in its briefs to this Court.
Specifically, the State’s briefs posit that a defendant “may” challenge a consent-based search when probable cause is strong, that a defendant “may” contend that “there was no genuine option to refuse consent,” and that a defendant “may” argue that consent was invalid based on fear of being detained for a prolonged period of time. However, the State points to no instances in which defendants have made such arguments, and it cites no case where a post-Peraor-Fiores consent search has been invalidated on such grounds. Nevertheless, the Court’s majority grabs hold of that *470 argument to support its conclusion that the State has proven unworkability.
The majority focuses on the State’s — again speculative — assertion that a motorist would feel pressure to consent at the prospect of being detained for an inordinate amount of time. Ante at 443-44, 126 A.3d at 870-71. However, it is not clear that the current average of fifty-nine minutes from the Burlington pilot program is an inordinate delay. Despite that voiced concern, the State does not demonstrate any earnest efforts to improve upon the results of the pilot program. Nor does the State address how its “fears” are balanced by the fact that law enforcement officials must inform people of their right to refuse consent in order to carry the State’s burden of showing that consent given was truly voluntary. Johnson, supra, 68 N.J. at 353-54, 346 A.2d 66 (holding that essential element of voluntary consent is “knowledge of the right to refuse consent”). Indeed, it is notable that not a single privacy or civil liberties group writes in support of the State’s position as amicus curiae. In fact, the ACLU, writing in support of defendant, does not decry the increase in consent searches following Pena-Flores as a negative unintended consequence of that decision.
The majority relies on the State’s asserted concern for motorists’ constitutional rights in the wake of an increase in consent searches. However, that concern is suspect in light of the fact that the State’s solution is to take away all motorists’ ability to first choose to consent by instead giving officers a nearly automatic right to search by way of a rote automobile exception to the warrant requirement based on unreviewed officer belief that probable cause exists. Instead of instituting increased officer training on consent-search procedures in order to prevent coercive situations — a logical and direct prophylactic measure against coercive consent searches — the State’s answer is to take away all choice from motorists. This “remedy” belies concern for constitutional rights and in fact scales back motorists’ constitutional protections.
Although the majority posits that detention on the side of road for an hour is, or at least debatably is, more intrusive than a *471 search of one’s vehicle, one wonders why individual motorists should not be allowed to make that determination for themselves. The rational response to the potentiality of placing motorists in a coercive situation is to properly train officers and to reduce or eliminate situational pressure to consent by developing functional and efficient electronic and telephonic warrant procedures so that motorists may comfortably choose for themselves whether to insist on the constitutional default — a warrant approved by a neutral magistrate — or whether to waive that right.
Finally, a few words on the last two justifications asserted in this record to overturn settled law on warrantless roadside searches of automobiles. The State asserts that Pencu-Flores has had (or perhaps will have) the effect of increasing “de-policing” and expanding police discretion. The State’s arguments on those points are equally if not more speculative than its arguments about the effects of consent-based searches.
As to the first, the State contends that when it is impractical to get a warrant to search a car, police will release motorists even though there is probable cause to search their cars, resulting in “de-polieing.” Although the 2012 OLEPS Study states that “many departments indicated that in the face of a denied consent, it was rare to apply for a search warrant,” the Study posits that the failure to apply for a warrant could have indicated de-polieing or lack of probable cause. 2012 OLEPS Study, supra, at 16. The study contains only speculation that de-policing was the motivating force behind an officer’s decision not to apply for a warrant when a motorist denied consent: “Rather than spend the several hours to apply for a search warrant and tow a vehicle, officers may have been willing to allow motorists to leave without further investigation.” Ibid, (emphasis added). In the absence of any data or statistics indicating that “de-policing” is in fact occurring, such raw speculation is not a basis on which to alter motorists’ constitutional rights.
As to the second, it bears noting that the last point made by the State in support of its claims — that by “forcing officers to decide *472 whether it is worth the time and effort to obtain a warrant, the Pena-Flores rule has unwittingly enlarged the ambit of a patrol officer’s enforcement discretion” — is similarly without basis in fact. Perhaps, in this regard, the State is merely latching onto the Pena-Flores dissent’s mischaracterization of the examples of exigency, helpfully set out in Cooke and in Pena-Flores, as a hard- and-fast multi-factor test that is difficult to apply. See Pena-Flores, supra, 198 N.J. at 26-29, 29, 965 A.2d 114 (noting that “[Ilegitímate considerations are as varied as the possible scenarios surrounding an automobile stop”); Cooke, supra, 168 N.J. at 668-71, 751 A.2d 92. The dissent in Pena-Flores was called out by the Pena-Flores majority for its inaccurate and misleading recasting of what the majority opinion said. Pena-Flores, supra, 198 N.J. at 29 n. 6, 965 A.2d 114 (explaining that contrary to dissent’s characterization, majority did not “establish a new ‘multi-factor test,’ ” but rather “merely detailed, by way of example but not limitation, the various factors that our prior eases have recognized as relevant to an exigency analysis”). Sadly, the dissent then, and the State and the majority now, persist in that mischaracterization.
The bull’s-eye that the Pena-Flores dissenters put on the back of that decision has finally paid off — not because of the proof that the State has mustered in this record, but rather from re-characterization of prior case law and lack of scrutiny of the State’s evidence in alleged support of its practicality argument. In my view, the majority’s analysis of the legal and factual bases for overturning Pena-Flores and Cooke are woefully inadequate. The State has not carried its burden to justify overturning our state constitutional law governing warrantless automobile searches and neither is the majority persuasive in its analysis that the State has done so.
IV.
The majority’s conclusion represents, in essence, a retreat to the federal standard for warrantless searches of an automobile *473 expressly rejected by the Court in Cooke. Ironically, the majority’s step towards the federal standard comes at a time when federal jurisprudence is deviating away from any per se categories of assumed exigency. See, e.g., McNeely, supra, — U.S. -, 133 S.Ct. 1552, 185 L.Ed.2d 696; Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710,173 L.Ed.2d 485 (2009).
In Gant, supra, the United States Supreme Court rejected the broad reading of its decision in New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), that would permit officers to conduct an automobile search incident to arrest, irrespective of whether the area searched was within the arrestee’s reach at the time of the search. 556 U.S. at 344,129 S.Ct. at 1720,173 L.Ed.2d at 497. The Court noted that “[cjonstruing Belton broadly to allow vehicle searches incident to any arrest would serve no purpose except to provide a police entitlement, and it is anathema to the Fourth Amendment to permit a warrantless search on that basis.” Id. at 347, 129 S.Ct. at 1721, 173 L.Ed.2d at 499 (emphasis added).
In McNeely, supra, the United States Supreme Court ruled that the dissipation of alcohol in the body, without more, did not constitute exigency to justify a warrantless blood draw of a drunk-driving suspect. — U.S. at-, 133 S.Ct. at 1568, 185 L.Ed.2d at 715. In doing so, the Court noted that
the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake. Moreover, a case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments.
[Id. at-, 133 S.Ct. at 1564, 185 L.Ed.2d at 710.]
Importantly, the McNeely Court noted that adoption of a restrictive, categorical approach would ignore technological changes in the expedition of obtaining warrants. Id. at-, 133 S.Ct. at 1561-63,185 L.Ed.2d at 708-09.
*474 One can only wonder why the State and the majority of this Court find it appropriate to turn from the progressive approach historically taken in this State to privacy and constitutional rights of motorists. I cannot join this backward step.
I respectfully dissent.
For affirmance and remandment — Chief Justice RABNER and Justices ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON — 5.
For dissent — Justice LaVECCHIA and Judge CUFF (temporarily assigned) — 2.

 See, e.g., State v. Reece, 222 N.J. 154, 168-69, 117 A.3d 1235 (2015) (noting exigency required for application of emergency-aid doctrine); State v. Walker, 213 N.J. 281, 295-98, 62 A.3d 897 (2013) (noting exigent circumstances justifying warrantless arrest); State v. Edmonds, 211 N.J. 117, 130-41, 47 A.3d 737 (2012) (emphasizing need for exigency showing in community caretaking cases).

 See Samantha Marcus, Body Cams Coming to a Cop Near You as N.J. Pledges Millions to Equip Officers, NJ.com (July 28, 2015), http://www.nj.com/politics/ index.ssf/2015/07/body_cams_.coming_to_a_cop_near_you_as_nj_pledges_ millions_to_equip_officers.html; Office of the Attorney General, Attorney General Law Enforcement Directive No. 2015-1 (July 28, 2015), available at http://www. state.nj.us/lps/dcj/agguide/directives/2015-l_BWC.pdf.

 Included in that discussion was Colvin, supra, 123 N.J. 428, 587 A.2d 1278. The majority diminishes Colvin by characterizing it as a decision "primarily based on pure exigent circumstances,” ante at 430, 126 A.3d at 862, even while acknowledging that the Colvin Court "introduced the issue as one that 'concerns the scope of the automobile exception,' ” ante at 429, 126 A.3d at 861 (quoting Colvin, supra, 123 N.J. at 429, 587 A.2d 1278) (internal quotation marks omitted). Contrary to the majority's portrayal, Colvin is in line with our past precedent and its analysis consistent with our requirement that exigent circumstances must be present to apply the automobile exception in New Jersey.

 The majority makes a point of noting that the average time for Troop C of the State Police to procure a telephonic warrant was between 1.5 and two hours. Ante at 436, 126 A.3d at 865. However, that statistic is the average only for Troop C, and was based on a universe of sixteen applications for telephonic warrants. Pilot Program, supra, at 10. It is hardly representative of the whole. The average time for the Burlington pilot program, based on a total of forty-two applications, six of which were from the State Police, was fifty-nine minutes. Id. at 6.

 Indeed the ACLU asserts that improvement was occurring; during the two months after the pilot program technically ended, but for which data was collected, the average time to obtain a telephonic warrant had decreased to forty-three minutes.

 The State adds one more point to its argument that telephonic warrants are unworkable. According to the State, the pilot program "by its very design, reveals why telephonic warrants are not likely to emerge as a viable replacement for the automobile exception.” The State contends that "[a]ll of the participants in the pilot program understood that police officers would continue their post-Pena-Flores practice of requesting motorists to consent to a search” prior to trying to obtain a telephonic warrant. Further, the State’s brief asserts that "participants recognized that the number of telephonic-warrant applications might overwhelm judicial and prosecutorial resources unless most cases ... [wejre screened out by means of the consent-to-search doctrine.” Thus, according to the State, the increase in consent searches, attributable to pilot program participants’ decision to ask for motorists' consent before applying for a warrant, *467 demonstrates that telephonic warrants are unfeasible. There is an undeniable circularity to that argument. If the number of telephonic warrant requests would have overwhelmed the system, one goal of the pilot program was to obtain data demonstrating that possibility. However, participants' preconceived notion that telephonic warrants were unworkable (and the resulting decision to rely on asking motorists for consent to search) does not prove that such warrants are in fact unworkable. It proves only that program participants had a preconceived belief that a telephonic warrant program was impracticable.