**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4781-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LAMAR S. ORTIZ,

     Defendant-Appellant.

_____

Submitted May 29, 2018 – Decided May 6, 2019

Before Judges O'Connor and Vernoia.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 15-09-2208.

Joseph E. Krakora, Public Defender, attorney for appellant (Brian P. Keenan, Assistant Deputy Public Defender, of counsel and on the brief).

Robert D. Laurino, Acting Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

O'CONNOR, J.A.D.

Following the denial of his motion to suppress evidence of a handgun, defendant Lamar S. Ortiz pled guilty to second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and fourth-degree possession of dum-dum bullets, N.J.S.A. 2C:39-3(f)(1). In accordance with the parties' plea agreement, the court sentenced defendant to an aggregate seven-year term of imprisonment. Defendant Lamar S. Ortiz appeals from the order denying his motion to suppress. We reverse and remand for further proceedings.

I

The salient evidence adduced during the suppression hearing was as follows. The State's sole witness, Detective Thomas Delmauro, testified that on May 10, 2015, the Newark Police Department received an anonymous tip that an African-American male in his mid-twenties was carrying a firearm in the area of Hunterdon Street in Newark. The caller said the man had dreadlocks, was wearing a white T-shirt, was driving a white Ford Expedition with New Jersey license plates that bore a specific number, and that the vehicle was on Hunterdon Street near Avon Avenue.

Around noon that day, Delmauro drove to that area in an unmarked vehicle, parked, and commenced his surveillance. Two other detectives,

2

Laurie and Santiago, were dispatched at the same time in a separate unmarked police vehicle. When Delmauro arrived, he found the Expedition described by the caller parked on Hunterdon Street. Delmauro parked across the street from the Expedition, and the other two officers parked one block away on Avon Avenue, which ran perpendicular to Hunterdon Street. Laurie and Santiago were the designated "take-down unit."

Within several minutes, Delmauro saw a person fitting the description provided by the caller on Hunterdon Street. That person was later identified as defendant. Delmauro repositioned his car, parking directly in front of the Expedition. Defendant subsequently got into the driver's seat of the Expedition.

Looking through the rear-view window of the surveillance car and into the windshield of the Expedition, Delmauro observed defendant handling a handgun that was black and khaki in color. He also saw defendant reach toward what Delmauro assumed was the glove compartment. Defendant then leaned back into the driver's seat, where he remained until Ahmad Manns, a man later identified as defendant's cousin, got into the Expedition and sat in the front passenger's seat.

3

Delmauro called the other detectives and advised that defendant had put a gun in the glove compartment of the Expedition, and Delmauro would let them know when defendant drove off. Defendant then made a K-turn on Hunterdon Street and headed toward Avon Avenue.

Delmauro followed the Expedition and called the other detectives to advise that defendant was headed toward them and to stop defendant's vehicle. Delmauro parked his car and walked to the spot where the other two detectives were conducting the stop. By then, defendant and Manns were standing at the rear of the Expedition; one detective was standing next to defendant and the other next to Manns.

The passenger door to the Expedition was open, so Delmauro reached in and opened the glove compartment, where he saw the gun he had previously observed defendant handling, along with the registration and insurance card for the Expedition. However, Delmauro testified he went into the glove compartment to look for the gun and not for the registration and insurance card. In fact, Delmauro commented defendant was not stopped because of a motor vehicle violation but to investigate whether there was a gun in the car.

Delmauro was questioned about but unable to provide any conclusive testimony concerning whether defendant and Manns were handcuffed before

4

Delmauro opened the glove compartment. When asked on direct examination what he did when he saw the gun in the glove compartment, Delmauro testified:

> I notified [the other detectives] that, you know, the gun is in the glovebox, but I'm not sure, I think they had him in handcuffs already. I think they had him in handcuffs before I was walking up because I told them that, you know, I already saw the gun in the glovebox. So for their safety they might have handcuffed him already, but I can't tell you for sure if they had him handcuffed before or after . . . .

On cross-examination, defense counsel questioned Delmauro as follows:

> Q. And before the search took place were the two occupants handcuffed?
>
> A. I don't recall if they were handcuffed at that point.
>
> Q. Where do you think -- where were they?
>
> A. They were in the rear of the vehicle.
>
> . . . .
>
> Q. And -- but you didn't see whether or not they were handcuffed?
>
> A. I don't recall if they were handcuffed. I don't believe they were until I opened the glovebox, but I don't recall for sure.
>
> . . . .

5

Q. Who was with [defendant and Manns] when they were in the rear?

A. I believe Det. Laurie was with the driver, Mr. Ortiz[,] and I believe Det. Santiago was standing with Mr. Manns.

Defendant was ultimately arrested for possession of a weapon. Manns was not arrested because, while at the scene of the stop, defendant admitted he was the owner of the subject handgun.

Defendant testified as follows. He confirmed he was in his mid-twenties and, at the time in question, was wearing, among other things, a white T-shirt, and eventually entered an Expedition that fit the anonymous caller's description. However, he stated he and his cousin got into the Expedition simultaneously. Defendant admitted he owned the subject gun, an olive and black Glock 30, and did not have a license to carry or purchase a firearm.

Defendant testified he put the subject gun into the Expedition the night before and never removed it. He stated that, as he was being pulled over by the police, he grabbed the registration and insurance card from the glove compartment so that he would be ready to present such documents to the police. However, because the gun was still in it, he locked the glove compartment.

6

Defendant claimed two officers approached his car and one instructed him to take the keys out of the car. Defendant placed the keys, his license, the registration, and the insurance card in his hand, which he extended out of the driver's side window. An officer grabbed what was in defendant's hand, opened the driver's side door, and pulled him out of the car. At the same time, another officer pulled Manns out of the passenger door. Defendant claims both he and Manns were taken to the rear of the Expedition and handcuffed.

According to defendant, Delmauro searched the Expedition for three to five minutes. Defendant heard Delmauro pulling on the glove compartment and another officer handed him the keys to the Expedition. Delmauro then opened and retrieved the gun from the glove compartment, and advised defendant and Manns they were pulled over and handcuffed because of the presence of the gun in the vehicle. Defendant testified he never gave the police permission to search the car.

Manns testified that when he and defendant were pulled over, they were instructed to turn off the car, put their hands up, and "have" the keys out of the window. He and defendant complied and the officers took the keys. An officer then asked for the "paperwork," and defendant gave the officer the "registration, insurance and all that." Manns claimed defendant never "reached

7

at any time to the glove compartment" before they were pulled over. Manns stated that just before defendant handed the documents to the officer, the documents were "just sitting on the middle because he just reached down and just grabbed [them]."

Manns testified the officer then asked them to step out of the car. They both got out and were taken to the rear of the Expedition, where they were handcuffed. The police told them they had been pulled over because they received a tip defendant had a gun in his car. An officer then searched the Expedition, looking under the seats and behind the front seats. One of the officers tried to open the glove compartment but discovered it was locked. After that officer got the keys from another officer, he was able to open the glove compartment and found a gun. Defendant told the police the gun was his; Manns was never arrested or charged with any crime.

The trial court did not make a finding about whether defendant and Manns were handcuffed or otherwise sufficiently secured to preclude them from gaining access to the gun when it was in the glove compartment. The court merely stated:

> [O]bviously if they're not secured[,] there would be
> some issue with regard to safety and the exigency
> circumstances apply because, obviously, they're
> entitled to make themselves reasonably safe . . . if

8

there's been a gun identified[.] . . . I found . . . the officer[] credible when it came to the observations with regard to the gun. So, he knows there's a gun in the car, he's entitled to know where it is to prevent him from getting shot by it.

As I said, the issue I have was . . . whether [defendant and Manns] were, in fact, secured at the back outside the vehicle [and] whether, in fact, they had handcuffs on or not[.] . . . [I]n fact, there was an issue with regard to whether they were or were not handcuffed at the time.

The court resolved the motion as follows.

Acknowledging it a "minor" point, the court found defendant was not credible when he claimed he removed the registration and insurance card from the glove compartment just before the stop, but found Delmauro's testimony on this point credible. The court noted Manns's testimony concerning when defendant removed the registration and insurance card from the glove compartment inconsistent with defendant's. On the basis that defendant's testimony on this particular point was inconsistent with Delmauro's and Manns's, and because there were "exigent circumstances," the court denied defendant's motion to suppress.

9

II

On appeal, defendant asserts the following argument for our consideration:

> POINT I:  BECAUSE THERE WAS NO EXIGENCY, THE WARRANTLESS SEARCH OF ORTIZ'S VEHICLE WAS ILLEGAL, AND THE EVIDENCE FOUND MUST BE SUPPRESSED.

In reviewing a motion to suppress evidence, this court must defer to the trial court's fact findings underlying its decision, "so long as those findings are supported by sufficient credible evidence in the record."  State v. Robinson, 200 N.J. 1, 15 (2009) (quoting State v. Elders, 192 N.J. 224, 243 (2007)).  We defer to the credibility determinations of the trial court, particularly its review of competing factual testimony, because these factual determinations "are substantially influenced by [the trial court's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy."  Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).  We reverse only when the determination is "so clearly mistaken 'that the interests of justice demand intervention and correction.'"  Ibid. (quoting Johnson, 42 N.J. at 162).

However, we need not defer to any legal conclusions reached from the established facts.  State v. Brown, 118 N.J. 595, 604 (1990) (holding that if

"the trial court acts under a misconception of the applicable law," we need not defer to its ruling). The trial court's application of the law is subject to plenary review on appeal. State v. Cleveland, 371 N.J. Super. 286, 295 (App. Div. 2004).

"The Fourth Amendment to the United States Constitution, and Article I, paragraph 7 of the New Jersey Constitution require that police officers obtain a warrant before searching a person's property, unless the search 'falls within one of the recognized exceptions to the warrant requirement.'" State v. Cassidy, 179 N.J. 150, 159-60 (2004) (quoting State v. DeLuca, 168 N.J. 626, 631 (2001)); see also State v. Pena-Flores, 198 N.J. 6, 18 (2009). A warrantless search is presumed invalid, which places the burden on the State to prove that a search "falls within one of the few well-delineated exceptions to the warrant requirement." State v. Pineiro, 181 N.J. 13, 19-20 (2004) (quoting State v. Maryland, 167 N.J. 471, 482 (2001)).

Because the subject incident occurred in May 2015, before the Supreme Court issued its decision in State v. Witt, 223 N.J. 409 (2015), in September 2015, there is no dispute the holding in Pena-Flores controls and governs our

11

review.[1]  198 N.J. at 28.  In <u>Pena-Flores</u>, the Court held the warrantless search of an automobile in New Jersey was permissible only

> where (1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant.  The notion of exigency encompasses far broader considerations than the mere mobility of the vehicle.
>
> [<u>Ibid.</u> (citations omitted).]

Here, the first two factors are not in dispute. The issue is whether exigent circumstances existed to justify the warrantless search of defendant's car.

In <u>Pena-Flores</u>, the Court held circumstances were deemed exigent if it was "impracticable to obtain a warrant when the police have probable cause to search the car."  <u>Id.</u> at 23 (quoting <u>State v. Colvin</u>, 123 N.J. 428, 437 (1991)). "[O]fficer safety and the preservation of evidence is the fundamental inquiry[,]" <u>id.</u> at 29, because until the vehicle is seized by the police and removed from the scene, "it is potentially accessible to third persons who might move or damage it or remove or destroy evidence contained in it," <u>State v. Alston</u>, 88 N.J. 211, 234 (1981).

---

[1]  <u>Pena-Flores</u> was prospectively overruled in <u>Witt</u>, 223 N.J. at 449.

Exigency must be determined on a case-by-case basis and "[n]o one factor is dispositive; courts must consider the totality of the circumstances." Pena-Flores, 198 N.J. at 29. Although "[t]here is no magic formula – it is merely the compendium of facts that make it impracticable to secure a warrant[,]" ibid., the Court in Pena-Flores identified a non-exhaustive list of factors a court must consider when determining the existence of exigent circumstances. These factors are:

> the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not, whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk.
>
> [Id. at 29-30.]

Here, although the trial court stated exigent circumstances existed, it did not identify what they were. We note it is undisputed that, when Delmauro opened the glove compartment, defendant and Manns were at the back of the vehicle and each was being guarded by a detective. Defendant and Manns testified they were handcuffed when at the back of the vehicle; Delmauro was

13

unable to remember with any certainty whether or not they were handcuffed when he opened the glove compartment.

The court did not make a finding whether defendant was credible when he claimed he and Manns were handcuffed at the back of defendant's vehicle while Delmauro entered the glove compartment. We are aware the court did not find defendant credible when he testified he removed the registration and insurance card from the glove compartment before the motor vehicle stop. However, the court did not state whether it found defendant's testimony on such point - which even the court characterized as minor - undermined defendant's credibility on other matters about which he testified. In addition, Manns testified he and defendant were handcuffed when Delmauro opened the glove compartment. The court did not make a finding about Manns's credibility on this particular assertion.

The court's failure to make these critical credibility findings compels that we remand this matter for the trial court to make the necessary findings about the witnesses' credibility on material issues, explicitly address the factors in Pena-Flores on the issue of exigent circumstances, and make express findings on whether a warrant was required before defendant's car was searched.

14

We also considered whether the protective sweep exception applies in this matter. That exception authorizes the police to perform a warrantless protective sweep of the passenger compartment of a vehicle when the totality of circumstances support a reasonable suspicion that a driver or passenger is dangerous and may gain immediate access to weapons. State v. Gamble, 218 N.J. at 431-32. The burden is on the State to present specific and articulable facts that, considered with the rational inferences from those facts, support the application of this exception. Ibid.

> The protective sweep exception in the automobile setting does not turn solely on the potential presence of a weapon in a vehicle. Instead, it addresses the imminent danger to police when a driver or passenger will be permitted access to a vehicle that may contain a weapon or may be in a position to evade or overpower the officers at the scene.
>
> [Robinson, 228 N.J. at 548.]

In Robinson, the Court found the protective sweep exception did not apply under the following facts. Late one evening in April 2012, a police officer on patrol noticed a car on the roadway that was being driven "unsafe[ly]." Id. at 536. The patrol officer activated his lights and conducted a motor vehicle stop. Ibid. The patrol officer obtained identifying information from the driver and his three passengers. Ibid. The dispatch officer

15

subsequently informed the patrol officer that the driver had an outstanding warrant for a drug offense and was known to carry weapons. Id. at 536-37. In addition, one of the passengers had an outstanding traffic warrant. Ibid. The patrol officer called for backup and four officers arrived. Id. at 537-38.

The two occupants who had warrants were removed from the car, arrested and handcuffed; no weapons were found in their possession. Id. at 537-38. After they stepped out of the car, the officers frisked the other two occupants, who did not possess any weapons. They were detained, but not handcuffed, on the roadside and monitored by the officers. Id. at 538. There was no evidence any of the four occupants of the car reached for a weapon or any other object in the car, and none resisted the officers' directions. Id. at 537-38.

One of the officers conducted a sweep of the interior of the car to check for weapons. Id. at 538. After searching the front driver and passenger areas, the officer picked-up a purse that was lying on the front passenger seat. Ibid. Feeling what he suspected was a handgun, the officer opened and discovered a handgun in the purse. Id. at 538-39. The police decided to seek a search warrant, and arranged to have the vehicle towed and impounded. Id. at 539.

16

The Court determined the protective sweep exception did not permit the police to search the car without a warrant. Id. at 549. The Court acknowledged that, given the dispatcher's report, one could have had reasonable suspicion a weapon might be inside the vehicle, and the fact weapons were not found on the occupants when frisked did not remove the need for concern. Id. at 548 (citing Gamble, 218 N.J. at 432-33). However, the Court found the officers' "swift and coordinated action eliminated the risk that any of the four occupants would gain immediate access to the weapon [in the purse on the front seat]." Id. at 535. Specifically, the Court noted:

> Because [the officer who stopped the vehicle] summoned four backup officers, the officers outnumbered the occupants of the vehicle. The officers arrested, frisked, handcuffed, and took into custody the two individuals with outstanding warrants . . . . They directed [the other two occupants], who were cooperative, to an area away from the vehicle and carefully monitored them. The officers thus assumed and maintained control of the vehicle and the scene. In light of that prudent police work, none of the four occupants was given an opportunity to return to the car. None was in a position to gain access to any weapon – the handgun in the vehicle, or the officers' service weapons – as might have happened had [the initial patrol officer] attempted to conduct the traffic stop alone, or with a single partner. In short, the record did not reveal specific and articulable facts that, at the time of [the] search of the vehicle, would reasonably warrant the conclusion that any of the

17

> vehicle's four occupants was potentially capable of gaining "immediate control of weapons."
>
> Accordingly, we conclude that the search of the car was not within the protective sweep exception to the warrant requirement.
>
> [Robinson, 228 N.J. at 549 (citation omitted).]

The Court's decision in Robinson underscores that, when determining whether the protective sweep exception applies, there must be specific and articulable facts that, at the time of the search of a vehicle, a person is capable of gaining immediate control of a weapon or weapons in the vehicle. A trial court must carefully consider the actual risk that exists. Whether that risk is present includes but is not limited to a consideration of the ratio of police officers to passengers; the ability of the police to keep passengers from entering a vehicle; and the passengers' or passenger's willingness to cooperate with the police.

Here, the trial court did not have the benefit of the Robinson opinion, decided approximately nine months after the trial court's ruling. Therefore, we conclude the proper course of action is, in addition to remanding this matter for the reasons previously stated, remand this matter for the trial court to reconsider its ruling in light of the decision in Robinson.

18

In the event the search of the glove compartment is found to be illegal under either one of the exceptions discussed, the trial court must also consider whether the doctrine of inevitable discovery applies.  See State v. Sugar (Sugar II), 100 N.J. 214, 237 (1984).  To reap the benefit of such doctrine, the State will have to show by clear and convincing evidence that:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [Id. at 238.]

Finally, the State contends the "driving documents" exception applies.  Under such exception, "a traffic violation may justify a search for things relating to that stop."  State v. Keaton, 222 N.J. 438, 448 (citing State v. Boykins, 50 N.J. 73, 77 (1967)).  Here, however, Delmauro admitted defendant was not stopped because of a traffic violation.  Moreover, Delmauro conceded he went into the glove compartment in search of the handgun, not in search of the registration and insurance card.  Therefore, the documents exception does not apply.

19

Reversed and remanded for further proceedings in conformity with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION